**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

IN RE APPLICATION OF SHERVIN
PISHEVAR FOR AN ORDER TO TAKE
DISCOVERY FOR USE IN FOREIGN
PROCEEDINGS PURSUANT TO 28
U.S.C. § 1782

Case No. 1:19-mc-00503-RA

---

### SUPPLEMENTAL DECLARATION OF CHARLOTTE WATSON

I, Charlotte Louise Hay Watson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.　　I submit this Supplemental Declaration in response to the declaration dated December 4, 2019 made by Teresa Rosen Peacocke which opposes Mr. Shervin Pishevar ("Petitioner")'s Application and Petition For An Order to Conduct Discovery For Use In Foreign Proceedings Pursuant To 28 U.S.C. § 1782 (the "1782 Application").

2.　　Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents, including the proposed subpoena; and (c) information supplied to me by Petitioner or professionals retained by Petitioner.

3.　　For a summary of the factual background of this matter, and my relevant qualifications, I refer to my declaration dated 31 October 2019.[1]

4.　　I also refer to the declarations of Lord Macdonald QC dated December 18, 2019 and that of Hugh Tomlinson Q.C. dated December 18, 2019.

---

[1]　*See* Dkt. No. 7.

1

**THE PROBATIVE VALUE AND NECESSITY OF THE EVIDENCE SOUGHT**

5.      At paragraphs 57-62 of her declaration, Ms. Peacocke deals with the value that would be derived from the disclosure source. In particular, in paragraph 57 she asserts that it would be a matter of *"pure speculation"* that Source 1 would be able to identify Source 2. We disagree with this. In any claim in defamation it is essential to establish who the 'publisher' is as "the material part of the cause of action in libel is not the writing, but the publication of the libel." *Hebditch v Macilwaine* [1894] 2 Q.B.54 CA.[2]  Ms Peacocke's speculative assertion that Source 1 will not  be able to identify Source 2 is contrary to known facts.  In fact, the Respondent's employer (i.e. Fast Company) has already confirmed to Petitioner's US counsel that the Respondent was told by Source 1 that the latter obtained the Forged Police Report from a "male" lawyer in the UK (i.e. Source 2).

6.      The identity of Source 1 (and by consequence Source 2) will be critical for bringing and proving the Petitioner's claims against Source 1, Source 2 and others involved in the creation and dissemination of the Forged Police Report.

7.      Indeed, the identity of the Sources should be established as soon as possible to enable the Petitioner to facilitate the proper commencement and prosecution of the English proceedings. If the identity of the Sources are not secured, not only will the Petitioner be unfairly deprived of his opportunity to seek justice, but it will enable the Sources to continue to disseminate false and defamatory information about the Petitioner.  Moreover, while the Petitioner for the purposes of this Declaration has confined their civil actions to negligent misstatement and libel/slander, the Petitioner reserves the right to raise further causes of action where applicable.[3]

---

[2]   A true and correct copy of the case is attached hereto as **Exhibit 1.**

[3] For example, the Petitioner also has a prima facie cause of action for breach of data protection under the Data Protection Act 2018 and a claim for misuse of private information.  In the event further

## THE LACK OF EXHAUSTION OF ALTERNATIVE MEANS TO OBTAIN THE INFORMATION

8.      At paragraphs 63-72 of her declaration, Ms. Peacocke suggests that the Petitioner has not exhausted all *alternative* means of obtaining the information requested. This assertion is misconceived. In particular, and contrary to Ms. Peacocke's assertions, a *Norwich Pharmacal* application (i.e. an application which seeks disclosure from a third party for use in a proceeding before English courts) would not be available here as there would be no potential targets to pursue in the English jurisdiction.  It is an elementary principle of English civil procedure that an applicant cannot make a *Norwich Pharmacal* application against a person unknown.  The name of the discovery target must be known.  This further stresses the importance of the Section 1782 proceeding, so that Petitioner, in obtaining Source 1's identity can seek to obtain further disclosure from that person so as to prosecute its claims, and in order to gather information about the identity of Source 2.  At that point, the Petitioner could then seek to pursue English disclosure remedies from Source 2 (assuming that individual is subject to the English jurisdiction, which appears to be the case as Mr. Baram has indicated he is a "male" lawyer based in the U.K.), whether through a pre-action disclosure application or a *Norwich Pharmacal* application (i.e. a third-party disclosure application).

9.      I would also further refer to Lord Macdonald's declaration in which he confirms Petitioner's efforts to obtain information, both through formal and informal channels, from the COLP. The COLP, however, does not possess information about the identity of the Forged Police Report.[4]

---

submissions are required on these additional causes of action I should be happy to provide further detail.

[4] *See* Macdonald Reply Decl., at ¶12.

**NEGLIGENT MISSTATEMENT**

10.     At paragraph 79 of her declaration, Ms. Peacocke asserts that the Petitioner would be unable to bring a claim for negligent misstatement on the basis that one is only available "*if the person making the statement knew that he would rely on such statement, and it was reasonable that he should so rely*". While it is acknowledged that, in its most standard interpretation, this would summarize the cause of action, Ms. Peacocke has completely ignored the reference made to the case of *Harold Wildgust and another v Bank of Ireland and another*[5]*,* a true and correct copy of which is attached as **Exhibit 11** of my first declaration dated 31 October 2019 (my "**First Declaration**").

11.     In *Wildgust,* the Supreme Court of Ireland established that that it was not necessary for the negligent misstatement to be made directly to the plaintiff, provided there was sufficient proximity between the parties.  Indeed, Ms. Peacocke gives examples of situations where negligent misstatements might be found such as statements made in an academic reference about a another. But *Wildgust* states that, in citing a passage from the speech of Viscount Haldane LC in *Naughton v Lord Ashburton* [1914] A.C. 932, which in turn was cited with approval by Lord Reid in *Hedley Byrne and Co. Limited v Heller and Partners Limited* [1964] AC 465, quite apart from contractual or fiduciary relationships, a duty of care in the making of a statement may arise *"from other special relationships which the court may find exist in particular cases"*.

12.     Given that Source 2 to Source 1, and in turn Source 1 to Mr. Baram, made statements which, in holding themselves out to be sources of private and highly sensitive information, were likely to be of interest to an investigative journalist, it is foreseeable that Mr. Baram would have relied (and indeed did rely) on the Forged Police Report in his publications. Furthermore, while the

---

[5] [2006] 2 ILRM 28.

statements were not made to the Petitioner directly, the reliance on them by Mr. Baram has undoubtedly led to economic loss to the Petitioner.

13.     On this basis, Ms. Peacocke's assertion that a claim for negligent misstatement would not be available to the Petitioner fails to consider the special relationship created by the sources to Mr. Baram, and the loss subsequently caused to the Petitioner, who was the subject and target of the misstatements and publications.

**LIBEL AND/OR SLANDER**

14.     Ms. Peacocke's assertion (para [85]) that my "*attempt to claim the U.K. (sic) law of libel as grounds for a potential claim by Mr Pishevar fares even worse*" namely that the Petitioner does not have grounds for bringing a claim in libel/slander is wrong, as, with respect, Ms. Peacocke has wholly misunderstood the basis for such claims as set out at paragraphs 40-44 of my First Declaration.

15.     In order to assist the Court and clarify the position I set out below a chronology of the relevant events:

a. In September 2017, Mr. Baram is informed by Source 1 that "he has obtained a copy of a police report documenting Mr Pishevar's Sexual Assault Arrest" (namely the "Forged Police Report");[6]

b. Later in September 2017 Mr. Baram met with Source 1 at a café in Washington D.C. during which a copy of the file containing the Forged Police Report was transferred to Mr. Baram's laptop. During that meeting Mr. Baram was informed by Source 1 that he had obtained the report from "a male lawyer based in the U.K" i.e. Source 2 (although

---

[6]  Mr. Baram's Affidavit, at para 8.

Mr. Baram now asserts in his Affidavit (see footnote at page 2) that the lawyer is not necessarily male).  Source 1 also reported to Mr. Baram that Source 2 had made a number of slanderous allegations to him about the Petitioner, which Source 1 published to Mr. Baram;

c.  On November 8, 2017, Fast Company published the article entitled: *"Smear Campaign" Or Not, Tech Investor Shervin Pishevar Really Was Arrested Earlier This Year*;

d.  Following the Fast Company article dated November 8, 2017, further articles were published including:

    i.  Forbes published an article on November 9, 2017 entitled: *"Shervin Pishevar, Arrested But Never charged over Alleged Rape, Says He's victim of "Smear Campaign"*;

    ii.  New York Post published an article on November 9, 2017 entitled: *"Billionaire ally of ex-Uber CEO busted on rape charge"*;

    iii.  The Telegraph published an article on November 17, 2017 entitled: "*American tech billionaire who gagged press over hotel rape claim is named"*.

    iv.  The Sun published an article on November 14, 2017 entitled: *"Victory for The Sun as Uber tycoon Shervin Pishevar who gagged us from identifying him is named over rape arrest"*

    v.  The Times published an article on November 14, 2017 entitled: "*The Billionaire Shervin Pishevar censored rape claim"*;

    vi.  The Times published an article on November 15, 2017 entitled: "*Tech billionaire who gagged press over rape claim 'is smear victim"*

vii.   The Daily Mail published an article  on November 13, 2017 entitled: *"Uber tycoon admits he was arrested over sex assault claim in London and drops his bid to gag the press – but still insists he's the target of smear campaign that he paid off 'Victim' and used prostitute:*

e.   The Petitioner could not bring proceedings in England and Wales in respect of the articles published by the Defendants domiciled in England (namely articles referred to at paragraph 15(d) iii  to vii above), as they were not defamatory of him, in that they did not convey a defamatory meaning. Nor could he bring proceedings against Fast Company within the English jurisdiction in respect of publication of its article in England, even though it did bear a defamatory meaning namely that there were reasonable grounds to suspect that the Petitioner had committed the offence in question due to the existence and content of the Forged Police Report, as pursuant to Section 9 Defamation Act 2013, a court would not have the jurisdiction to hear and determine such an action.  Therefore, no defamation claims were brought in England and Wales by the Petitioner in respect of <u>publication of the articles in November 2017.</u>

f.   On  September 18, 2019, following disclosure by Fast Company, the Petitioner <u>first learnt</u> the facts set out at points 1 and 2 above, as well as the fact that Source 2 was a "male" lawyer based in the UK'.

16.   So it was only on September 18, 2019 that the Petitioner became aware of the following defamatory publications:

a.   A libellous publication by Source 1 to Mr. Baram in September 2017 which he informed Mr. Baram, via electronic communication, *"that he had obtained a copy"* of the Forged

Police Report *"documenting Mr. Pishevar's Sexual Assault Arrest"* (para [8] of Mr. Baram's declaration);

b. A libellous publication by Source 1 to Mr. Baram in September 2017, at the meeting in Washington D.C., after Mr. Baram had received the electronic communication, when Source 1 gave Mr. Baram the *"thumb drive which contained an image"* of the Forged Police Report (para [8] of Mr Baram's declaration);

c. A slanderous publication by Source 1 to Mr. Baram, at the meeting in September 2017,of the following false allegations, namely that:

    i. The Petitioner had paid the complainant in the rape allegation the sum of £300,000;

    ii. The allegation was being handled by City of London Police "gold Command" for assessments of forensic and other supporting evidence; and

    iii. Police at Bishopsgate police station were "outraged" over the situation and were demanding a review of police procedures in the case

d. A libellous publication by Source 2 to Source 1 of the Forged Police Report at sometime between May 2017 and September 2017;

e. A slanderous publication by Source 2 to Source 1 of the false allegations set out at 16 c. above at sometime between May 2017 and September 2017.

17.    It is in respect of the publications set out at paragraph 16 above, by Sources 1 and 2 and not any "stories written by Mr Baram" (see paragraph 85 of Ms Peacocke's Declaration) that the Petitioner seeks an order under s32A Limitation Act 1980 that the limitation period of one year should be disapplied.

18.     Further, it was only on September 18, 2019 that the Petitioner learnt there was a potential defendant based in England and Wales.  The Petitioner has no information to date about the domicile of Source 1 and prima facie, as the four elements of both a libel and a slander action have been satisfied, the Petitioner has grounds to bring defamation claims against Source 1 as well as Source 2.

19.     I would repeat the summary of the applicable chain of causation relating to defamation as set out at paragraph 41 of my First Declaration.  Party A can bring an action against Party B, where Party B has published to Party C something that adversely affects Party A's reputation.  An action for libel/slander requires that there was a defamatory statement that was published to a third party, which identifies the party bringing the claim and has caused or is likely to cause them serious harm to their reputation.

20.     The libel and slander actions can be distinguished as follows:

> i.    The publications made in a non-transient form (such as in writing) by Source 1 to Mr. Baram in providing the thumb drive, would be libel; and
>
> ii.   The publication of the allegations referred to at paragraph 15(c) above and any transient communications between Source 1 and Source 2, would be slander.

21.     For the reasons set out above, there is a clear chain of causation between the statements made by Sources 1 and 2, and the serious harm caused to the Petitioner's reputation.

22.     As Ms. Peacocke has misunderstood which publications the Petitioner intends to bring proceedings upon her assertions at paragraphs 86, 87 and 91 of her Declaration are unfounded.  Also as far as paragraph 92 is concerned Ms. Peacocke's reference to the date of the "alleged defamation" being June 2017 is wrong.  In June 2017 there was no "alleged defamation", as what the Petitioner was made aware of then was a potential breach of his privacy by the Sun newspaper in that there were

threatening, unlawfully, to name him as the individual who had been arrested in respect of the alleged incident on May 28, 2017.  The injunction my firm successfully obtained against the Sun was not in libel, but was under the law of privacy to prevent, pursuant to Article 8 of the Human Rights Act 1998, a gross misuse of the Petitioner's private information by naming or identifying him as the individual who had been arrested on May 28, 2017.

23.     Further, the references by Ms. Peacocke to *Nugent v Willers* [2019] UKPC 1 at paragraph 90 only assist the Petitioner, as he only became aware of the publication less than three months ago and he has clear and concrete (as opposed to "vague and unsatisfactory") evidence as to why he has only just learnt of the publications.  Due to the reasons set out at paragraph 15(e) above the Petitioner was unable to bring libel proceedings in November 2017 to clear his name of the very grave defamatory allegations made of him and it is only upon receipt of the information on September 18, 2019 that he now has the opportunity to do so.

24.     It is noted that Ms. Peacocke also seeks to raise Mr. Baram's *"reporter's privilege"* (para [94]) in opposition to the disclosure.  I refer to the Declaration of Hugh Tomlinson QC dated December 18, 2019 which deals with this point and with which I concur.

**THE DISCOVERY SOUGHT BY THE 1782 APPLICATION**

25.     The information provided by Respondents, pursuant to the 1782 Application, will be used to identify the Persons Unknown (i.e. the author(s) and disseminators of the Forged Police Report) in order to adequately conduct the civil proceedings through resolution.  Petitioner will use the identity of the authors of the Forged Police Report as follows:

26.     For an negligent misstatement action to:

    a.   adequately plead that a duty of care has been breached; and

      b.   enforce any relief obtained by the court.

27.    For a libel and/or slander action to:

      a.   Adequately identify who published the defamatory Forged Police Report;

      b.   Evidence to the court that the limitation period should be disapplied and an action permitted; and

      c.   Enforce any relief obtained by the court.

28. For further applicable civil actions (including but not limited to) breach of data protection and misuse or private information to:

      a.   Adequately identify the appropriate defendant in those actions; and

      b.   Enforce any relief obtained by the court.

29.    Notwithstanding the submissions made by Ms. Peacocke (para [66]), the Petitioner has no other way to obtain this information other than through the Section 1782 assistance of the US court.  Indeed, it is only as a consequence of Mr. Baram confirming that Source 2 is a lawyer based in the UK (whom may be male or female) that  the identity of Source 2 been narrowed.  The COLP has confirmed that the Forged Police Report was not leaked by them (a point acknowledged by Mr. Baram in paragraph 19 of his Affidavit).  Given it is Mr. Baram that met Source 1, and received the Forged Police Report from him, he is the only one that can provide the information requested.

30.    Petitioner will be able to use and introduce any information obtained pursuant to the 1782 Application at any stage of the English civil proceedings, though it would be preferable to obtain the information prior to filing the Contemplated Civil Proceedings in order to issue proceedings against the actual author(s) or Sources of the Forged Police Report rather than "Persons Unknown" (and then have to amend pleadings to substitute Persons Unknown with the name(s) of the report's author(s) or Sources so that the proceedings can proceed through resolution).

31.     I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.


Executed on this 18th day of  December, 2019 in London, England.



_Charlotte Watson_
Charlotte Watson