# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF SHERVIN PISHEVAR FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 19-MC-503-RA |

## BRIEF OF AMICI CURIAE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND MEDIA LEGAL DEFENCE INITIATIVE IN SUPPORT OF RESPONDENT MARCUS BARAM

## CORPORATE DISCLOSURE STATEMENTS

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors with no parent corporation and no stock.

The Media Legal Defence Initiative is a charity registered with the Charity Commission in the United Kingdom and has no parent corporation and no stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENTS ........................................................... ii

TABLE OF AUTHORITIES ................................................................................ iv

INTEREST OF AMICI CURIAE ........................................................................... 1

INTRODUCTION .............................................................................................. 2

ARGUMENT ................................................................................................... 3

I.      The integrity of a confidential reporter-source relationship is critical to producing
        quality journalism. ............................................................................... 3

        A.      Confidential sources play a crucial role in stories of national and international
                import. .................................................................................... 3

        B.      Both courts and legislatures recognize that compelling disclosure of
                journalists' confidential sources can chill newsgathering. ..................... 8

II.     The Court should use its broad discretion under Section 1782 to uphold domestic
        protections for newsgathering. ................................................................. 12

CONCLUSION ............................................................................................... 15

CERTIFICATE OF SERVICE .............................................................................. 16

# TABLE OF AUTHORITIES

## Cases

*Bachchan v. India Abroad Pubs., Inc.*, 585 N.Y.S.2d 661 (N.Y. Sup. Ct. 1992)......................... 11

*Baker v. F & F Inv.*, 470 F.2d 778 (2d Cir. 1972) ........................................................ 10

Becker v. Norway, App. No. 21272/12 (Eur. Ct. H.R. 2017)........................................... 7

*Giuffre v. Maxwell*, 221 F. Supp. 3d 472 (S.D.N.Y. 2016) ...................................... 9, 10

*Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29 (2d Cir. 1999)....................................... 9

Goodwin v. United Kingdom, App. No. 17488/90, 22 Eur. H.R. Rep. 123 (Eur. Ct. H.R. 1996) . 7

*Holmes v. Winter*, 22 N.Y.3d 300 (N.Y. 2013) ...................................................... 9, 11

*In Re Green Dev. Corp. S.A. de C.V.*, Civil No. WDQ-15-2985, 2015 WL 10319091
 (D. Md. Oct. 1, 2015)............................................................................ 14

*In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5 (2d Cir. 1982) ............................... 10

*In re Request of Oric*, No. 04 C 7300, 2004 WL 2980648 (D. Md. Dec. 23, 2004) ................... 14

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ...................... 12, 13

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). ............................................ 14

*People v. Silverstein*, 412 N.E.2d 692 (Ill. App. Ct. 1980)......................................... 10

*Schoolcraft v. City of New York*, No. 10-CV-6005, WL 2014 1621480 (S.D.N.Y. Apr. 18, 2014)
 ............................................................................................. 9, 10

Tillack v. Belgium, App. No. 20477/05 (Eur. Ct. H.R. 2007)....................................... 8

*United States v. Cutler*, 6 F.3d 67 (2d Cir. 1993) ................................................. 10

*United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011) ............................................... 9

*von Bulow by Auersperg v. von Bulow*, 811 F.2d 136 (2d Cir. 1987) ...................... 9, 11, 13

*Yahoo!, Inc. v. La Ligue Contre le Racisme et L'Anti-semitisme*, 169 F. Supp. 2d 1181
 (N.D. Cal. 2001) ................................................................................. 11

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) ..................................................... 3

## Statutes

28 U.S.C. § 1782(a) (2018).............................................................................. 12

N.Y. Civ. Rights Law § 79-h(b) ......................................................................... 9

SPEECH Act, Pub L. No. 111-223, 124 Stat. 2380 (2010) ......................................... 11

## Legislative History

S. Rep. No. 88-1580 (1964)......................................................................... 12, 13

## Other Authorities

Alexander M. Bickel, *The Morality of Consent* (1975) .................................................................. 3

Alexandra Berzon et al., *Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn*, Wall S.J. (Jan. 27, 2018, 1:02 AM), https://perma.cc/AVC5-FZ2X .......... 6

Austin Ramzy & Chris Buckley, *'Absolutely No Mercy': Leaked Files Expose How China Organized Mass Detentions of Muslims*, N.Y. Times (Nov. 16, 2019), https://perma.cc/K2AG-2RP6 .......................................................................................................................................... 4

Bethany Allen-Ebrahimian, *Exposed: China's Operating Manuals for Mass Internment and Arrest by Algorithm*, Int'l Consortium of Investigative Journalists (Nov. 24, 2019), https://perma.cc/ZK3P-Y2Y5 ...................................................................................................... 5

Brett Spain, *Reporter's Privilege Compendium: Virginia*, Part II.C, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/ privilege-compendium/virginia/#c-federal-constitutional-provision .......................................... 8

Daisuke Wakabayashi & Katie Benner, *How Google Protected Andy Rubin, the 'Father of Android'*, N.Y. Times (Oct. 25, 2018), https://perma.cc/2YYQ-CQF4 ...................................... 6

David Kaye, Special Rapporteur on the Promotion and the Protection of the Right to Freedom of Opinion and Expression, *Report on the Promotion and Protection of the Right to Freedom of Opinion and Expression* U.N. Doc. A/70/361 (Sept. 8, 2015) .................................................... 8

David Kravets, *Reporters Challenge Bonds' Leak Subpoena*, Associated Press (May 31, 2006), https://perma.cc/2JS6-5N7C ...................................................................................................... 4

Douglas Dalby & Amy Wilson-Chapman, *Panama Papers Helps Recover More than $1.2 Billion Around the World*, Int'l Consortium of Investigative Journalists (Apr. 3, 2019), https://perma.cc/5XY5-AMKM .................................................................................................. 7

Frederik Obermaier et al., *About the Panama Papers*, Süddeutsche Zeitung, https://perma.cc/9NW2-Y2KZ .................................................................................................. 6

*Introduction to the Reporter's Privilege Compendium*, Reporters Committee for Freedom of the Press, https://www.rcfp.org/introduction-to-the-reporters-privilege-compendium/ .................. 2

Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017), https://perma.cc/QFP7-C4CV ........................................ 5

*Reporter's Privilege Compendium Map*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/reporters-privilege/ .................................................................................. 8

*Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/privilege-sections/a-generally/ ................................................................ 8

Rodney A. Smolla, *The First Amendment, Journalists, and Sources: A Curious Study in "Reverse Federalism,"* 29 Cardozo L. Rev. 1423 (2008) ....................................................... 10

Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, The New Yorker (Oct. 10, 2017, 10:47 AM), https://perma.cc/KL3G-YJ98 ...... 6

Tim Arango et al., *The Iran Cables: Secret Documents Show How Tehran Wields Power in Iraq*, N.Y. Times (Nov. 19, 2019), https://perma.cc/ZUU7-WV7X .................................................. 5

Uyghur Human Rights Policy Act of 2019, S. 178, 116th Cong. (2019) ........................................ 5

## INTEREST OF AMICI CURIAE[1]

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee") and the Media Legal Defence Initiative ("MLDI").

The Reporters Committee is an unincorporated nonprofit association, founded by leading journalists and media lawyers in 1970, when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

MLDI is a non-governmental organization that provides legal support and helps defend the rights of journalists, bloggers, and independent media across the world. It is based in London and works closely with a world-wide network of experienced human rights lawyers, as well as local, national and international organizations, donors, foundations and advisors who are all concerned with defending freedom of expression. As part of its mandate, MLDI engages in strategic litigation to protect and promote freedom of expression. MLDI has intervened in many cases before the European Court of Human Rights including in seminal cases involving issues around newsgathering and source protection.

Amici respectfully submit this brief in support of journalist Marcus Baram, who is facing a demand under 28 U.S.C. § 1782 ("Section 1782") to reveal a confidential source in discovery for contemplated foreign proceedings. Journalists rely on relationships with confidential sources to investigate and report on important issues of public interest. They therefore depend upon the

---

[1]     No party's counsel authored this brief in whole or in part, and no party, party's counsel, or any person other than amici curiae or their counsel contributed money that was intended to fund preparing or submitting this brief. Respondent Marcus Baram consents to the filing of this brief; Applicant Shervin Pishevar takes no position.

1

constitutional, statutory, and other protections afforded under federal, state, and international law to maintain these relationships and shield their work product and the identities of their confidential sources from compelled disclosure.  Amici seek to highlight the importance of confidentiality in newsgathering activities and how the use of Section 1782 in cases like Mr. Baram's can chill reporter-source communications and investigative reporting.

## INTRODUCTION

The compelled disclosure of a confidential source has a particular and substantial impact on the integrity of the newsgathering process.  Journalists necessarily rely on sources for information about sensitive and important issues.  Many such sources require confidentiality before coming forward because they reasonably fear retribution if their identities are revealed, including the loss of employment, risk of physical harm, or, as here, threat of criminal prosecution.  *See Introduction to the Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/introduction-to-the-reporters-privilege-compendium/ (last visited Dec. 17, 2019).

Journalists consistently rely on those confidential sources to break important news stories that serve the public interest.  Recent examples include reporting in the United States based on secret documents from China and Iran, investigative reporting that led to the #MeToo movement, and groundbreaking coverage of offshore financial havens made possible by an anonymous leak of the "Panama Papers."  These stories would not have been possible without reporters' ability to give sources reliable assurances of confidentiality or anonymity.  Granting an application under Section 1782 to force Mr. Baram to identify his confidential source in this case, in circumvention of well-established legal protections for reporters' sources and work product, will have a detrimental effect on the ability of the news media to investigate and report on matters of public

concern now and in the future. Given the broad discretion afforded to courts by Section 1782,

amici urge the Court to reject the application.

## ARGUMENT

**I.    The integrity of a confidential reporter-source relationship is critical to producing quality journalism.**

**A.    Confidential sources play a crucial role in stories of national and international import.**

A journalist's ability to foster and maintain confidential relationships with sources is

essential to effective reporting. *See Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981)

("[J]ournalists frequently depend on informants to gather news, and confidentiality is often

essential to establishing a relationship with an informant."); *see also Introduction to the*

*Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, *supra*. When

sources stop talking to news organizations because they fear that their identities cannot be

protected, the public loses out on valuable information. Courts have recognized that

discouraging confidential sources from speaking to the press stifles the vital flow of information

to the public and thus undermines the electorate's ability to make informed political, social, and

economic decisions and to hold elected officials and others accountable. *See, e.g.*, *Zerilli*, 656

F.2d at 711 (explaining that protection of reporters' confidential sources serves the health of a

democracy by ensuring that citizens have access to information needed to make informed

choices); *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000) ("If reporters were

routinely required to divulge the identities of their sources, the free flow of newsworthy

information would be restrained and the public's understanding of important issues and events

would be hampered in ways inconsistent with a healthy republic."); *see also* Alexander M.

Bickel, *The Morality of Consent* 84 (1975) ("Forcing reporters to divulge such confidences

would dam the flow to the press, and through it to the people, of the most valuable sort of

information: not the press release, not the handout, but the firsthand story based on the candid talk of a primary news source.").

Indeed, many history-altering news stories about both government and private activities would not have been possible without journalists' ability to assure their sources confidentiality. One of the most famous examples is the reporting of *The Washington Post*'s Carl Bernstein and Bob Woodward on the involvement of the Nixon Administration in the Watergate break-in and subsequent cover-up. Mr. Bernstein recalled, "Almost all of the articles I co-authored with Mr. Woodward on Watergate could not have been reported or published without the assistance of our confidential sources and without the ability to grant them anonymity, including the individual known as Deep Throat." David Kravets, *Reporters Challenge Bonds' Leak Subpoena*, Associated Press (May 31, 2006), https://perma.cc/2JS6-5N7C.

In more recent years, as the nature of newsgathering has become increasingly borderless, journalists have continued to rely on information provided by confidential sources both overseas and in the United States to report on stories of national and international significance. Accordingly, the protection of reporter-source confidentiality in the United States is even more crucial to preserve the free flow of information across international borders in service of reporting in the public interest. For example, both *The New York Times* and the International Consortium of Investigative Journalists (ICIJ) relied on confidential sources to obtain separate troves of Chinese Communist Party documents detailing the Chinese government's motivations and false statements in connection with the planning and operation of internment camps detaining Uyghurs and other ethnic minorities. Austin Ramzy & Chris Buckley, *'Absolutely No Mercy': Leaked Files Expose How China Organized Mass Detentions of Muslims*, N.Y. Times (Nov. 16, 2019), https://perma.cc/K2AG-2RP6; Bethany Allen-Ebrahimian, *Exposed: China's*

*Operating Manuals for Mass Internment and Arrest by Algorithm*, Int'l Consortium of Investigative Journalists (Nov. 24, 2019), https://perma.cc/ZK3P-Y2Y5.  Fewer than two weeks after the latter of these stories broke, the U.S. House of Representatives passed a bill to sanction Chinese officials responsible for the detention camps and restrict the export of items to China that could be used for surveillance.  *See* Uyghur Human Rights Policy Act of 2019, S. 178, 116th Cong. §§ 7, 9 (2019).

Another story, also from November 2019, centered around a leaked archive of secret Iranian cables provided to *The Intercept* and shared with *The New York Times* for a collaborative report that demonstrated how Iran has extended its influence in Iraq in the wake of the U.S. invasion and subsequent troop withdrawal.  Tim Arango et al., *The Iran Cables: Secret Documents Show How Tehran Wields Power in Iraq*, N.Y. Times (Nov. 19, 2019), https://perma.cc/ZUU7-WV7X.

Confidential sources have also been instrumental in investigative journalism that has exposed wrongdoing by private companies and powerful individuals.  For example, in the initial exposé revealing a decades-long history of allegations of sexual harassment and sexual assault by entertainment executive Harvey Weinstein—one of the stories that sparked the #MeToo movement—journalists at *The New York Times* obtained at least one settlement record and learned the details of several more from undisclosed sources.  *See* Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017), https://perma.cc/QFP7-C4CV.  Ronan Farrow, a reporter who has broken multiple celebrity sexual assault stories for *The New Yorker*, also relied on a then-unnamed source to gain access to a secret recording in which Mr. Weinstein is heard apologizing to one of his alleged victims.  *See* Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey*

*Weinstein's Accusers Tell Their Stories*, The New Yorker (Oct. 10, 2017, 10:47 AM), https://perma.cc/KL3G-YJ98.

 Numerous other stories from the past several years have relied on maintaining the confidentiality of victims, as well as those sources who provide corroborating testimonial and documentary evidence.  Of the over 150 sources *The Wall Street Journal* contacted and interviewed in detailing sexual misconduct allegations against casino magnate Steve Wynn—"none [of whom] reached out to the Journal on their own"—most preferred anonymity because "they worried that [speaking out] could hurt their ability to work elsewhere."  Alexandra Berzon et al., *Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn*, Wall S.J. (Jan. 27, 2018, 1:02 AM), https://perma.cc/AVC5-FZ2X.  Similarly, most of the more than three dozen current and former Google employees who revealed alleged sexual misconduct by several top Google executives asked for their identities not to be disclosed "because they were bound by confidentiality agreements or feared retribution for speaking out."  Daisuke Wakabayashi & Katie Benner, *How Google Protected Andy Rubin, the 'Father of Android'*, N.Y. Times (Oct. 25, 2018), https://perma.cc/2YYQ-CQF4.  Absent a journalist's ability to guarantee confidentiality, many of these victims and witnesses might never have come forward.

 Finally, an anonymous source was critical to the "Panama Papers," a leaked cache of data about offshore financial havens, which had been transmitted securely and anonymously to reporters.  *See* Frederik Obermaier et al., *About the Panama Papers*, Süddeutsche Zeitung, https://perma.cc/9NW2-Y2KZ (describing the nearly 50-years' worth of data illustrating fraud, money laundering, tax evasion, and evasion of international sanctions under the shelter of Panamanian corporate service provider Mossack Fonseca).  The transnational reporting team that broke this story announced that the global tally of fines and back-taxes resulting from the

Panama Papers reporting totals more than one billion dollars.  *See* Douglas Dalby & Amy

Wilson-Chapman, *Panama Papers Helps Recover More Than $1.2 Billion Around the World*,

Int'l Consortium of Investigative Journalists (Apr. 3, 2019), https://perma.cc/5XY5-AMKM.

Though the Panama Papers were obtained from an anonymous source unknown to the reporting

team, subpoenas to those journalists for electronic communications records or other material to

identify the source of the Panama Papers would implicate many of the same newsgathering

concerns raised by a subpoena seeking to force a reporter to reveal the identity of a confidential

source.

Applicant Pishevar's legal theory in this case would permit a party to a contemplated

foreign proceeding to use domestic discovery processes under Section 1782 to identify

confidential sources supplying U.S. journalists with newsworthy information, even if such a

demand were prohibited under U.S. or foreign law.  Allowing Section 1782 to be used in such a

way would impair the ability of journalists to assure their sources confidentiality, and

significantly obstruct the flow of newsworthy information to the public.  Discovery under

Section 1782 should not be granted, where, as here, it is aimed at compelling a journalist to

reveal his source and used to subvert widely recognized domestic and international reporter-

source confidentiality protections.  *See, e.g.*, Goodwin v. United Kingdom, App. No. 17488/90,

22 Eur. H.R. Rep. 123, 143 (Eur. Ct. H.R. 1996) (holding that Article 10 of the European

Convention on Human Rights requires that any compelled disclosure of a journalist's

confidential source must be "justified by an overriding requirement in the public interest.").[2]

---

[2]     European authorities, animated by many of the same concerns as courts and legislatures in the United States, have consistently emphasized the importance of protecting journalistic sources and materials. *See, e.g.*, Becker v. Norway, App. No. 21272/12, ¶ 40 (Eur. Ct. H.R. 2017), http://hudoc.echr.coe.int/eng?i=001-177349 ("In the light of the importance attached to source confidentiality, any restrictions must be genuinely exceptional and subject to the highest

**B.      Both courts and legislatures recognize that compelling disclosure of journalists' confidential sources can chill newsgathering.**

Recognizing the need to shield journalists from routine demands for their sources and work product, the vast majority of state and federal jurisdictions across the country provide journalists with legal protection against subpoenas targeting the identities of their sources. At the federal level, ten of the twelve federal courts of appeals—including the Second Circuit—have recognized some form of a qualified privilege rooted in the First Amendment or common law. *See Reporter's Privilege Compendium*, Part III.A, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/privilege-sections/a-generally/ (last visited Dec. 17, 2019). And, with the exception of Hawaii and Wyoming, every state in the United States has adopted or recognized some form of legal protection for a journalist's confidential sources, providing a critical safeguard for the newsgathering process. *Reporter's Privilege Compendium Map*, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/reporters-privilege/ (last visited Dec. 17, 2019). Most of these protections are statutory "shield" laws, but some are judicially recognized privileges grounded in First Amendment or common law principles. *See id.*; *see also* Brett Spain, *Reporter's Privilege Compendium: Virginia*, Part II.C, Reporters Comm. for Freedom of the Press, https://www.rcfp.org/privilege-compendium/virginia/#c-federal-constitutional-provision (last visited Dec. 17, 2019) (explaining that the Virginia

---

standards[.]" (quoting David Kaye, Special Rapporteur on the Promotion and the Protection of the Right to Freedom of Opinion and Expression, *Report on the Promotion and Protection of the Right to Freedom of Opinion and Expression*, ¶ 21, U.N. Doc. A/70/361 (Sept. 8, 2015))); *see also* Tillack v. Belgium, App. No. 20477/05, ¶ 65 (Eur. Ct. H.R. 2007), http://hudoc.echr.coe.int/eng?i=001-83527 ("The Court emphasises [sic] that the right of journalists not to disclose their sources cannot be considered a mere privilege to be granted or taken away depending on the lawfulness or unlawfulness of their sources, but is part and parcel of the right to information, to be treated with the utmost caution.").

Supreme Court recognized a privilege under the First Amendment in *Brown v. Commonwealth*, 204 S.E.2d 429 (Va. 1974)).

New York, in particular, has one of the country's strongest statutory shield laws. Enacted in 1970 "to provide the highest level of protection in the nation" for those who gather and report the news, *Holmes v. Winter*, 22 N.Y.3d 300, 308-09 (N.Y. 2013), the law applies in both civil and criminal matters, and provides absolute protection from the forced disclosure of materials received by a journalist in confidence, including the identity of a source. *See* N.Y. Civ. Rights Law § 79-h(b); *Giuffre v. Maxwell*, 221 F. Supp. 3d 472, 476 (S.D.N.Y. 2016).

The Second Circuit has recognized a qualified reporter's privilege that, in large part, traces "the contours" of the New York statute. *Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 34 (2d Cir. 1999). District courts within the Second Circuit have found that privilege to be rooted in both the First Amendment and federal common law. *See, e.g.*, *Schoolcraft v. City of New York*, No. 10-CV-6005, 2014 WL 1621480, at *2 (S.D.N.Y. Apr. 18, 2014) (citing cases); s*ee also von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987) ("[T]he process of newsgathering is a protected right under the First Amendment, albeit a qualified one. This qualified right, which results in the journalist's privilege, emanates from the strong public policy supporting the unfettered communication of information by the journalist to the public."). And the Second Circuit has held that the qualified privilege is "stronger" when it has the potential to "protect[] confidential materials." *United States v. Treacy*, 639 F.3d 32, 42 (2d Cir. 2011). "[T]o protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *In re Petroleum Prods. Antitrust Litig.*, 680

9

F.2d 5, 7 (2d Cir. 1982) (finding an "insufficient basis" for the district court to require the

identification of confidential sources and citing *Baker v. F & F Inv.*, 470 F.2d 778, 783–85 (2d

Cir. 1972)); *see also United States v. Cutler*, 6 F.3d 67, 71 (2d Cir. 1993).

Together, these statutory and judicially recognized protections for journalists'

confidential sources reflect a "'national referendum' attesting to [the United States'] sense of the

critical role that a vibrant press plays in a free society." Rodney A. Smolla, *The First*

*Amendment, Journalists, and Sources: A Curious Study in "Reverse Federalism,"* 29 Cardozo L.

Rev. 1423, 1429 (2008). Indeed, states across the country have found such laws necessary to

protect the "paramount public interest" in maintaining "a vigorous, aggressive and independent

press." *People v. Silverstein*, 412 N.E.2d 692, 695 (Ill. App. Ct. 1980) (quoting *Baker v. F&F*

*Inv.*, 470 F.2d 778, 782 (2d Cir. 1972) and discussing the Illinois legislature's adoption of that

state's shield law), *rev'd on other grounds*, 429 N.E.2d 483 (Ill. 1981); *see also Giuffre*, 221 F.

Supp. 3d at 477 ("New York courts have pointed out the legislature's express purpose in passing

the Shield Law was 'to avoid problematic incursions into the integrity of the editorial process.'"

(internal quotation marks and citations omitted)). The Second Circuit has explained that the

qualified reporter's privilege is needed to protect the press's "ability to perform its duties" and to

avoid the risk of "the symbolic harm of making journalists appear to be an investigative arm of

the judicial system, the government, or *private parties*." *Schoolcraft*, 2014 WL 1621480, at *4

(emphasis added) (quoting *Gonzales*, 194 F.3d at 35) (noting that privilege applies less

stringently to nonconfidential information in granting in part and denying in part journalist's

motion to quash a subpoena). Though these laws vary in their application and the scope of the

protection they afford, they stand for one unified proposition: protection for journalists'

confidential sources is "essential to [the] maintenance of our free and democratic society." *Holmes v. Winter*, 22 N.Y.3d 300, 303–09 (N.Y. 2013).

Consistent with this "strong public policy" protective of press freedom, *see von Bulow by Auersperg*, 811 F.2d at 142, courts have refused to recognize foreign court judgments deemed violative of the First Amendment and domestic public policies.  *See, e.g.*, *Bachchan v. India Abroad Pubs., Inc.*, 585 N.Y.S.2d 661 (N.Y. Sup. Ct. 1992) (refusing to recognize a British libel judgment under the public policy exception in New York's foreign judgment recognition statute on grounds that British libel law did not accord the protection to free speech and press embodied in U.S. and state constitutions); *Yahoo!, Inc. v. La Ligue Contre le Racisme et L'Anti-semitisme*, 169 F. Supp. 2d 1181, 1192 (N.D. Cal. 2001) (refusing to enforce a French court's order, requiring an Internet service provider (ISP) to block French citizens' access to Nazi material displayed or offered for sale on the ISP's U.S. site on the ground that the order's content and viewpoint-based regulation is "clearly" inconsistent with the First Amendment), *rev'd and remanded with instructions to dismiss*, 433 F.3d 1199 (9th Cir. 2006), *cert. denied*, 126 S. Ct. 2332 (2006).  Following these cases, Congress passed the Securing the Protection of Our Enduring and Established Constitutional Heritage (SPEECH) Act in order to combat "libel tourism" in which individuals seek out "foreign jurisdictions that do not provide the full extent of free-speech protections to authors and publishers that are available in the United States." SPEECH Act, Pub L. No. 111-223, § 2, 124 Stat. 2380, 2380–81 (2010).  By passing the SPEECH Act, Congress has prohibited the recognition of foreign libel judgments "inconsistent with United States first amendment protections," *id.*, and prevented litigants from using foreign proceedings to circumvent domestic press protections in libel cases.

II.    **The Court should use its broad discretion under Section 1782 to uphold domestic protections for newsgathering.**

The legislative history of 28 U.S.C. § 1782(a) and subsequent case law interpreting it reinforce this Court's authority to rigorously enforce the First Amendment and common law protections for newsgathering recognized under both New York and Second Circuit law.

Although Congress's primary purpose in passing Section 1782 was to streamline discovery for litigants involved in international disputes in light of "the growth of international commerce" and thereby induce concomitant respect from foreign tribunals, *see Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 248 (2004), the Senate report notes that the authors of the legislation were careful to include a privilege carveout as a "flexible provision" that "provides for the recognition of *all* privileges to which the person may be entitled."  S. Rep. No. 88-1580, at 9 (1964) (emphasis added).  The report explains that "[t]he absence of specific reference to any particular privilege leaves the recognition of the privileges to which the person is entitled to development by case law or separate statute or rule," and "stresses judicial freedom to achieve equitable accommodation of witness' interests."  *Id.* at 9, 11.  Congress ultimately passed the statute with the following exception:  "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."  28 U.S.C. § 1782(a) (2018).

At a minimum, and as Petitioner appears to concede, the qualified reporter's privilege recognized by the Second Circuit is applicable here under Section 1782(a)'s privilege carveout.  *See* Mem. of Law in Supp. of Pet'r's Appl. and Pet. for an Order to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782 at 26-27, No. 19-mc-00503 (S.D.N.Y. Oct. 31, 2019).  Moreover, "[i]n examining the boundaries of the journalist's privilege, [this Court] may consider also the applicable state law, in this case New York's so-called 'Shield Law.'"  *von*

*Bulow by Auersperg*, 811 F.2d at 144.  The Reporters Committee therefore urges the Court to apply these standards to find that Mr. Baram may not be forced to identify his source in violation of any reporter's privilege and deny Petitioner's application.  *See* Mem. of Law in Opp'n to Pet'r's Application and Pet. for an Order to Conduct Disc. for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782 at 9–15, No. 19-mc-00503-RA (S.D.N.Y. Dec. 4, 2019).

Further, the commitment to robust protections for press freedom manifested in state "shield" laws (like New York's); the qualified reporter's privilege recognized by federal courts across the country; and the First Amendment principles that undergird these safeguards, counsels in favor of employing this Court's broad discretion to deny the application.  In *Intel Corp.*, the Supreme Court emphasized that district courts may choose not to grant Section 1782(a) discovery requests even where they "ha[ve] the authority to do so," and noted that district courts should consider in their decisions, among three other discretionary factors, "whether the [Section] 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or *other policies* of a foreign country *or the United States*."  542 U.S. at 264–65 (emphases added).  *Intel Corp.* underscores "judicial freedom" to determine the appropriateness of a particular Section 1782 request, S. Rep. No. 88-1580, at 11, using discretionary factors, even where the court finds that all statutory requirements have been met.

As set forth above, confidential sources—including those who may be abroad—play a critical role in national and international stories of immense interest to the American public.  *See* Section I.A, *supra.*  Many such sources would be unwilling to come forward if American journalists could not assure them confidentiality.  Moreover, First Amendment considerations are heightened when, as here, the identified source would not benefit from domestic protections like the "actual malice" standard in a defamation lawsuit by a public figure.  *See New York Times Co.*

*v. Sullivan*, 376 U.S. 254, 279–80 (1964). These were the same type of concerns that led the courts to reject the enforceability of foreign judgments from countries less protective of free speech rights in numerous cases preceding the passage of the SPEECH Act. *See* Section I.B, *supra*. This case, where a U.S. person is trying to invoke a (not yet initiated) foreign proceeding to force the disclosure of the identity of a U.S. journalist's source, is exactly the type of case where U.S. courts should consider the strong domestic policies in favor of protecting reporter-source relationships and exercise their discretion to prevent harm to the public's right to know.

Indeed, in the few instances where a Section 1782 application was aimed at a journalist, other courts have considered its potential to interfere with the exercise of First Amendment rights, and have rejected such discovery demands. *Compare In Re Green Dev. Corp. S.A. de C.V.*, Civil No. WDQ-15-2985, 2015 WL 10319091, at *4 (D. Md. Oct. 1, 2015) (refusing to grant ex parte Section 1782 application in part because it sought to "force the journalist . . . to reveal confidential sources used in the preparation of his article"), *aff'd*, Civil No. CCB-15-2985, 2016 WL 640791 (D. Md. Feb. 18, 2016), *with In re Request of Oric*, No. 04 C 7300, 2004 WL 2980648, at *1 (D. Md. Dec. 23, 2004) (finding "that the First Amendment has little bearing when information demanded under [Section] 1782(a) does *not* come from a confidential source" (emphasis added)).

Given the critical importance of confidential sources to newsgathering, the widely recognized public benefit from strong legal protections against the compelled disclosure of journalists' sources, and the broad discretion inherent in Section 1782, this Court should not permit discovery under Section 1782 to force a reporter to disclose the identity of a confidential source.

14

## CONCLUSION

For all these reasons, amici urge the Court to deny the Section 1782 application.


Dated: December 19, 2019          Respectfully submitted,

                               */s/ Katie Townsend*

                               Katie Townsend
                               THE REPORTERS COMMITTEE FOR
                                FREEDOM OF THE PRESS
                               1156 15th St. NW, Suite 1020
                               Washington, DC 20005
                               Phone: (202) 795.9300
                               Facsimile: (202) 795.9310
                               ktownsend@rcfp.org

                               *Counsel of Record for Amici Curiae*

**CERTIFICATE OF SERVICE**

I, Katie Townsend, do hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of Court for the United States District Court for the Southern District of New York using the CM/ECF system on December 19, 2019.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Katie Townsend*
Katie Townsend
*Counsel of Record for Amici Curiae*