**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

IN RE APPLICATION OF SHERVIN
PISHEVAR FOR AN ORDER TO TAKE
DISCOVERY FOR USE IN FOREIGN
PROCEEDINGS PURSUANT TO 28
U.S.C. § 1782

Case No. 1:19-mc-00503-RA

**DECLARATION OF DR. GORDON RAMSAY**

I, Dr. Gordon Ramsay, hereby declare as follows:

1. I submit this declaration in support of Petitioner's Memorandum of Law In Response to
   Brief of Amici Curiae Reporters Committee Freedom of the Press and Media Legal
   Defence Initiative ("Amici Brief") and in Support Of Petitioner's Application And
   Petition for An Order To Conduct Discovery For Use In Foreign Proceedings Pursuant To
   28 U.S.C. §1782 (the "1782 Application").

2. I have been retained by Petitioner to opine on various aspects of journalism practices and
   digital misinformation in response to the Amici Brief. Unless otherwise indicated, all
   facts set forth in this declaration are based upon: (a) my personal knowledge and research;
   (b) my review of relevant documents, including the Amici Brief and other memorandum
   of law and supporting documents filed in this matter; and (e) information supplied to me
   by the Petitioner or its officers, directors, and employees, or professionals retained by
   them.

3. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them
   in the 1782 Application and accompanying memorandum of law.

**I.      BACKGROUND AND QUALIFICATIONS**

4. I am a scholar with 14 years' experience of conducting research on the role of journalism
   in democracies both in academia and in policy think-tank environments.  I currently hold

1

the position of Visiting Researcher at the University of Westminster, developing projects analyzing media regulation in the UK and the societal effects of declining public interest news provision.  I co-founded the Centre for the Study of Media, Communication and Power at King's College London in 2015, where – among other research – I conducted an innovative project measuring the use of journalism by the Russian state to insert disinformation into overseas news environments, culminating in the report *Weaponising News: RT, Sputnik and Targeted Disinformation* (2019, King's College London).  I was a core participant in the UK's 2012 Leveson Inquiry into the culture, practice and ethics of UK journalism through my role as Research Fellow at the Media Standards Trust, and between 2016 and 2019 I administered a series of meetings of peers in the House of Lords on developments in media and regulation.

5.  I attach my CV as **Exhibit 1**.

## II.         SOURCE PROTECTION AND DIGITAL DISINFORMATION

6.  The Amici Brief supplied by the Reporters' Committee for Freedom of the Press and the Media Legal Defence Initiative cites a number of cases where confidential sources supplied information central to the publication of news articles of clear relevance to the public interest and the public's right to know.  Each case concerns verifiable documents or data, or the disclosure of statements given directly by sources in return for the protection of anonymity.  In the words of the Amici Brief, these disclosures concern "the vital flow of information to the public" affecting "the electorate's ability to make informed political, social, and economic decisions and to hold elected officials and others accountable."  The use of confidential sources in cases that meet these important criteria has clear justifications in liberal democratic theory and in practice.

7.  Information that comprises deliberately forged content does not satisfy these criteria. Forged content that is designed to harm, however circulated, does not represent the

articulation by an individual of an idea or opinion – the definition of self-expression that is justifiably subject to protections in a free democratic society (O'Neill, 2009: 171).  Nor does it advance "the vital flow of information to the public."  On the contrary, it acts as "information pollution" (Wardle and Derakhshan, 2017), injecting misleading and manipulated or false information into the news environment.  The privileges that journalism justifiably enjoys in the public interest in relation to confidentiality are therefore inverted in such a case: the public is misled as to both the reality that the forged content is designed to misrepresent, and to the credibility and motivations of the source of the original message.

8. This has wider implications for communication in the public interest:

> "One aspect of the public interest… is the public interest in <u>truthfulness</u>… Here there are two kinds of interest.  There is the direct interest that individuals have in <u>not being deceived or misled</u>. … But there is also a second indirect interest in truthfulness, an interest in maintaining a culture of trust. If communication is believed to be untruthful (or inaccurate), then trust in communication may vanish." (Leveson Report (2012) Volume I, p.81, paraphrased witness statement of Dr Neil Manson (emphasis in original)).

9. Forged content that is disseminated via journalism satisfies contemporary criteria of disinformation as "[the] dissemination of explicitly false or misleading information" (Benkler et al., 2018: 32) or "[i]nformation that is false and deliberately created to harm a person, social group, organization or country" (Wardle and Derakhshan, 2017: 20).  There is emerging evidence that state and private actors seek to leverage the protections of journalism to circulate disinformation and construct messages designed to attract the attention of news organisations for transmission to their audiences, while it is increasingly accepted that the increased circulation of disinformation in modern democratic societies poses a profound threat to the flow of information, trust in journalism, and the circumstances in which journalism itself can properly operate.

10. In response to the Amici Brief, I therefore assert the following three related points that are relevant to the present case:

   a. Forged content designed for dissemination through news media, whether knowingly or not, does not represent the vital flow of information to the public.  Nor does it represent a speech act motivated by concerns for the wider public's right to know;

   b. Forged content fulfils the criteria of disinformation at a time where the tactical use of journalism as a protected channel of disseminating disinformation in a digital media environment is increasing; and

   c. The increased circulation of disinformation through news media has profound implications for trust in journalism and the stability of liberal democratic societies.

   If these are accepted, the protections of confidentiality in this case work against, rather than serve, the wider public interest justifications for their use.

11. Speech is central to the operation of democratic society.  It provides important value to the public to the extent that it represents a legitimate act of self-expression on the part of a source, and that through its communication via a media outlet it serves the information needs of audiences and of the public more widely.  These needs are served when the information is true (and verifiably so) and therefore contributes to the information necessary for participation in social and civic life, and where audiences are able to assess the credibility of the speech and the reasons for it being uttered.  The issue of "assessability" of communicated content is relevant to justifications of confidentiality.

12. The sharing for publication of forged content designed to circulate misleading information about an individual does not meet the definition of an acceptable act of self-expression due to the its inherent intent to mislead audiences and to cause harm to another individual (O'Neill, 2012: 3).  This holds true regardless of the process by which it comes to be published.  The re-publication of the content by a media organization under

conditions of confidentiality also does not satisfy the needs of audiences or the public interest, due to its inherent ability to mislead audiences and to cause harm and the lack of assessability of its message:

> …censorship of media content is not the only risk against which readers, listeners and viewers need protection.  The needs of audiences are also disregarded or shortchanged unless others' communication, including media communication, allows them to understand what is said and to assess what is done in saying it. Intelligibility and assessability matter for all communication, and more so for the communication of the powerful (O'Neill, 2011).

13. Communication, as distinct from self-expressive speech by individuals, needs to be assessable by intended audiences through offering them the means to assess what is claimed.  Without this, "communication will be systematically impaired, with resulting damage to those aspects of social, cultural and democratic life that depend on media communication" (O'Neill, 2012: 8).

14. This is especially relevant in the case of confidential sources and the defense of their use in general:

> [T]here may be a case for a *tightly drawn public interest* exemption that allows *some* sources to be kept confidential for *specific* reasons in *particular* situations in matters of genuine public interest.  But there is no general case for refusing to inform readers, listeners and viewers what the important sources are – as good journalists have long done (O'Neill, 2012: 9, emphasis in original).

15. Assessability in this case is especially relevant given that the published speech does not represent an act of self-expression but instead consists of content designed to mislead and to achieve a particular end.  Forged content is designed with inherent communicative purpose, and when circulated to the public by media organisations it benefits from anonymity, the increased exposure offered by media publication, and the acquired authority of the media organisation.

16. The capacity to establish credibility is fundamental for citizens to establish the trustworthiness of information, particularly in digital news environments characterised by abundance of information and multiplicity of sources.  Credibility or believability of

information is based largely on the trustworthiness of information sources as interpreted by receivers of information (Metzger and Flanagin, 2013).  Research has established that individuals apply a series of cognitive heuristics when assessing the credibility of information, including what has been termed the 'persuasive intent heuristic' whereby individuals perceive cues that they are being manipulated by bias on the part of the source—most commonly recorded in response to advertising or fears of ulterior motives that might underlie information.  "In many cases, people note that this is a primary cue that they use to determine credibility, often using it as a heuristic stopping rule for credibility judgements" (Metzger and Flanagin, 2013: 2016).

17. The use of journalism to bypass this cognitive function has been recorded by commercial actors in the process of 'Churnalism', where commercial entities craft PR copy to try to leverage the authority and trustworthiness of news organisations and to mask their connection to information designed to persuade audiences (Lewis et al., 2008), and through native advertising (Pickard, 2020).  More recently, however, the same mechanism has been detected in the creation and dissemination of disinformation by the Russian state, in addition to the use of the format of journalism to benefit from speech protections when publishing disinformation and propaganda (Ramsay and Robertshaw, 2019).

18. Disinformation is becoming more prevalent in the contemporary media environment due to changes in media systems, economics and technologies, including the availability of cheap and sophisticated tools for the creation and distribution of misleading content, either through direct dissemination or through expectations of newsworthiness.  It poses a profound threat to the flow of information within democratic societies, as well as for the operation of journalism itself.  The acuteness of the problem has prompted recent work to

define the definitions and effects of disinformation, and the processes through which it is disseminated.

19. In a Council of Europe report, Wardle and Derakhshan (2017: 5) distinguish between three types of 'Information Disorder', of which disinformation ("false information knowingly shared to cause harm") is deemed the most harmful to the free flow of information due to its fulfilment of the criteria of both falsity (unlike mal-information) and its intent to harm (unlike misinformation).  Disinformation is designed exclusively to evade assessability and to prevent audiences determining the credibility of the information it contains and must be understood in terms of the creation and reception of the message, and the processes by which it is delivered to audiences.

20. The centrality of the use of journalism as a tool for spreading disinformation has been acknowledged in multiple studies (Marwick and Lewis, 2017; Wardle, 2017).  Wardle and Derakhshan (2017: 25) note that "The role of the mainstream media as agents in amplifying (intentionally or not) fabricated or misleading content is crucial to understanding information disorder". The authors further specify that media organisations have an obligation not to facilitate the spread of disinformation by refraining from disseminating fabricated content and to effectively assess the credibility of any sources of information and the information itself.

21. The forged content at issue in the present case meets established definitions of disinformation.  It is a message created with the explicit intent to cause specific harm, and to mislead through the combination of fabrication, the impersonation of an official and authoritative document, and the manipulation of genuine information.  In doing so it fulfils three of seven 'categories of information disorder' (Wardle, 2017).  The direct or indirect reliance on news media to circulate the message obscures the assessability of the message and the credibility of the original source, benefiting from anonymity while

increasing the exposure of the message and leveraging the authority of the news organisation among audiences.

22. This serves the opposite purpose of information made available by whistleblowers to news organisations and deemed to be worthy of protection through confidentiality. It is intended instead to amplify misleading information, and does not represent an act of self-expression, but rather an intentionally altered message of obscured provenance. In addition, it furnishes an example of the growing tactical use by disinformation campaigns of journalistic protections to prevent restrictions on the spread of disinformation (most notable in the creation of international news outlets by state actors to carry disinformation – *see* Ofcom, 2018).

23. The wider social effects of the prevalence of disinformation for democratic society are profound. As disinformation campaigns become more sophisticated, evidence shows that audiences are poorly equipped to distinguish real from false information online (Breakstone et al. 2019). Such campaigns increasingly capitalise on social and political divisions, tactically using uncertainty and lack of information to influence targeted audiences (Benkler et al, 2018; Hjorth and Adler-Nissen, 2019).

24. Equally dangerous is the reputational damage to, and reduced trust in, journalism through the intentional or unintentional dissemination of false or harmful information. A 2017 Reuters study on audience perspectives on low trust in media noted that:

> Reduced trust in journalism, whether found in mainstream or social media, matters because of its role in supporting the democratic process and informing citizens so they can make choices at elections and referendums, but also in holding the rich and powerful to account (Newman and Fletcher, 2017: 7).

25. Audience studies show that audiences identify fabricated content, whether for-profit or politically motivated, as sitting outside their conception of what news is and should be (Nielsen and Graves, 2017), and that they acknowledge that journalists have the main responsibility to stop the spread of disinformation in journalism (European Commission,

2018).  Journalism should, it has been argued, be actively engaged in minimising or reducing the circulation of disinformation when it is detected.

26. The need for journalism to perform its essential democratic functions is greater than it has been for decades.  The circulation of disinformation alongside genuine journalism may represent an existential threat to the capacity of democratic societies to distinguish between truth and falsehood and to conduct discourse on common ground, while declining trust and authority in the conduct of journalism damages the capacity of citizens to hold powerful interests to account and to make informed decisions and choices about their civic and social life.  While remedies for this situation go beyond the capacities of journalism, news organizations should seek to prevent of the spread of disinformation, rather than facilitate it.

27. The confidentiality protections for information that serves the public interest and that is verifiably true or represents the self-expression of an individual are vitally important for democratic society and for journalism's key role within it. Forged content designed to harm, as a clear form of disinformation, fits none of these criteria and its circulation weakens journalism and democratic society more widely.  The extension of confidentiality protections to cover the spread of information that has been identified as disinformation serves to exacerbate this weakness and serves the purpose that disinformation is constructed to achieve.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.
Executed on this 7th day of January, 2020.

Dr. Gordon Ramsay

9

## ANNEX A

**References & Bibliography**

Benkler, Yochai, Robert Faris and Hal Roberts (2018) *Network Propaganda: Manipulation, Disinformation, and Radicalization in American Politics*, Oxford: Oxford University Press

Breakstone, Joel et al. (2019) *Students' Civic Reasoning: A National Portrait*, Stanford History Education Group, https://purl.stanford.edu/gf151tb4868

European Commission (2018) *Flash Eurobarometer 464: Fake news and disinformation online*, https://ec.europa.eu/commfrontoffice/publicopinion/index.cfm/ResultDoc/download/DocumentKy/82797

Hjorth, Frederik and Rebecca Adler-Nissen (2019) 'Ideological Asymmerty in the Reach of Pro-Russian Digital Disinformation to United States Audiences,' *Journal of Communication*, 69:2, 168-192

Leveson Inquiry (2012) *An Inquiry into the culture, practices and ethics of the press, Volume I*, https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/270939/0780_i.pdf

Lewis, Justin, Andrew Williams and Bob Franklin (2008) 'A Compromised Fourth Estate? UK news journalism public relations and news sources,' *Journalism Studies*, 9:1, 1-20

Marwick, Alice and Rebecca Lewis (2017) *Media Manipulation and Dis-information Online*, Data & Society, https://datasociety.net/pubs/oh/DataAndSociety_MediaManipulationAndDisinformationOnline.pdf

Metzger, Miriam J. and Andrew J. Flanagin (2013) 'Credibility and trust of information in online environments: The use of cognitive heuristics,' *Journal of Pragmatics*, 59, 210-220

Newman, Nic and Richard Fletcher (2017) *Bias, Bullshit and Lies: Audience Perspectives on Low Trust in the Media*, Oxford: Reuters Institute for the Study of Journalism

Nielsen, Rasmus Kleis and Lucas Graves (2017) *"News you don't believe": Audience perspectives on fake news*, Oxford: Reuters Institute for the Study of Journalism, https://reutersinstitute.politics.ox.ac.uk/sites/default/files/2017-10/Nielsen&Graves_factsheet_1710v3_FINAL_download.pdf

Ofcom (2018) *Ofcom Broadcast and On Demand Bulletin, Issue number 369*, Ofcom.org.uk, 20th December 2018, https://www.ofcom.org.uk/__data/assets/pdf_file/0020/131159/Issue-369-Broadcast-and-On-Demand-Bulletin.pdf

O'Neill, Onora (2009) 'Ethics for Communication?' *European Journal of Philosophy*, 17:2, 167-180

O'Neill, Onora (2011) 'The rights of journalism and the needs of audiences,' *Reuters Memorial Lecture, November 2011* https://reutersinstitute.politics.ox.ac.uk/risj-review/rights-journalism-and-needs-audiences

O'Neill, Onora (2012) 'Media Freedoms and Media Standards,' *Centre for Ethics and Law Annual Lecture 2012*, London: University College London

Pickard, Victor (2020) *Democracy Without Journalism? Confronting the misinformation society*, Oxford: Oxford University Press

Ramsay, Gordon and Sam Robertshaw (2019) *Weaponising News: RT, Sputnik and Targeted Disinformation*, London: King's College London https://www.kcl.ac.uk/policy-institute/assets/weaponising-news.pdf

Wardle, Claire (2017) 'Fake News. It's Complicated,' *firstdraftnews.org*, 16th February, 2017, https://firstdraftnews.org/latest/fake-news-complicated/ (Accessed 4th January 2020)

Wardle, Claire and Hossein Derakhshan (2017) *Information Disorder: Toward an interdisciplinary framework for research and policy making*, Council of Europe report DGI(2017)09, https://rm.coe.int/information-disorder-report-version-august-2018/16808c9c77