UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF SHERVIN PISHEVAR FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:19-mc-00503-RA |

**DECLARATION OF THE RT HON. DOMINIC GRIEVE QC**

I, Dominic Grieve, hereby declare as follows:

1.      I submit this declaration in support of Petitioner's Memorandum of Law In Response to Brief of Amici Curiae Reporters Committee Freedom of the Press and Media Legal Defence Initiative ("Amici Brief") and in Support Of Petitioner's Application And Petition for An Order To Conduct Discovery For Use In Foreign Proceedings Pursuant To 28 U.S.C. §1782 (the "1782 Application").

2.      I have been retained by Petitioner to express an opinion on various aspects of journalistic privilege raised by the Amici Brief . Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge and research; (b) my review of relevant documents, including the Amici Brief and other memorandum of law and supporting documents filed in this matter; and (e) information supplied to me by the Petitioner or its officers, directors, and employees, or professionals retained by them.

3.      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the 1782 Application and accompanying memorandum of law.

I.      **BACKGROUND AND QUALIFICATIONS**

4.      I am a barrister practising at the Bar of England and Wales since 1980. I was made a Queen's Counsel in 2008. During my practice I have done both criminal and civil

1

work and acted as a prosecuting counsel in criminal cases.

5. I served as the Member of Parliament (MP) for Beaconsfield from 1997 to 2019, and served as Shadow Home Secretary from 2008 to 2009. During my service, I was appointed to the opposition front bench in 1999 as spokesman on Constitutional affairs and moved to the Home affairs team covering criminal justice in 2001 before being made shadow Attorney General in 2003. In 2008 I was made shadow Home Secretary and shadow Justice Secretary in 2009. I also served as a member of the Standards and Privileges Committee and Chairman of the Intelligence and Security Committee of Parliament.

6. I was recognised for my work in Parliament with three awards: Parliamentarian of the Year in 2005 and in 2014 by a Lifetime Achievement award from Liberty, followed by the Halsbury Rule of Law Award in 2015, both for my support of Human Rights  I have specialised on issues relating to Law and Order, civil liberties and international affairs.

7. From May 2010 to July 2014, I held the office of Attorney General of England and Wales and Advocate General for Northern Ireland. The Attorney General is the principal legal adviser to the United Kingdom government with a wide range of responsibilities to ensure the maintenance and promotion of the Rule of Law throughout government. These include responsibility for the superintendence of the work of the Crown Prosecution Service of England and Wales and its Director of Public Prosecutions and power to intervene in a number of fields to protect the smooth administration of justice including by bringing proceedings for contempt of court, as Guardian of the Public Interest, a role that has to be discharged entirely separately and uninfluenced by any party political considerations from government . In that capacity I personally brought and presented proceedings for contempt of court against a number of publishers of United Kingdom newspapers including the leading case of Attorney General v (1) MGN Ltd (2) News Group Newspapers Ltd [2011] EWHC

2074 (admin) (ENG) which concerned the improper reporting of background matters to a criminal investigation in a manner that would have undermined the possibility of a fair trial for the suspect.

8. As Attorney General I was also involved in ensuring by reasoned persuasion that the balance of freedom of expression against that of the right to a fair trial and fair process is observed by the press. Since leaving ministerial office I have continued to take an active interest in the current debate on balancing civil liberties and human rights with security.

9. I attach my CV as **Exhibit 1**.

II. **SECTION 10 OF THE CONTEMPT OF COURT ACT 1981**

10. I understand that the Respondent, Mr. Baram, came into possession, as a journalist, of a document purporting to be a Police Report of the City of London Police (COLP), concerning the Petitioner. This document is a forgery, as established by aCOLP internal inquiry. That forged COLP Report was given to the Respondent by an individual whom he can identify (Forged Distributor 1), who himself claimed to have received it from another unnamed individual (Forged Distributor 2). Material from the forged report was published online by the Respondent, after he knew that the document was not authentic, as he had been informed by COLP twice before publication (in emails on October 20, 2017 and October 24, 2017). The Petitioner is seeking disclosure of the identity of Forged Distributor 1 in the courts of New York, so as to be able to pursue civil and criminal claims in the English courts for the creation and circulation of the forgery and the damage to him which resulted from it. The Respondent is resisting that claim on the grounds of "journalistic privilege" as enshrined in section 10 of the Contempt of Court Act 1981 (the Act).

11. The Amici Brief makes direct reference to the Respondent's purported right to withhold the identity of Forged Distributor 1 on the grounds of "international reporter source

confidentiality protections." *See* Amici Brief, at 7.

12. I have been asked for my opinion on the correct interpretation and application of the journalistic privilege in the circumstances outlined above. Under English law, this necessarily involves the interpretation and application of section 10 of the Act and how a court in England will approach the requirement in that section that "…no court may require a person to disclose the source of information contained in a publication for which he is responsible…unless that disclosure is necessary in the interests of justice or national security or for the prevention of disorder or crime."

13. The Contempt of Court Act 1981 was brought in to provide a fairer balance between the right to freedom of expression and the interests of justice in its widest sense. It sought to reflect the principles of the European Convention on Human Rights (ECHR) and in particular Article 10, which has since been incorporated into English law in the Human Rights Act 1998. Section 10 of the Contempt of Court Act was intended to give journalists a measure of protection against having to disclose their sources so as to protect both their right to privacy of receiving communications and their right to freedom of expression. It is widely recognised in the United Kingdom and in countries adherent to the ECHR that a free press is a bulwark of freedom and democracy and Section 10 of the Act was designed to reflect this. But freedom and democracy are also dependent on the operation of the rule of law and the ability to investigate and prosecute criminal acts fairly and fearlessly and to ensure that individuals cannot enjoy immunity from the consequences of their criminal and tortious acts.

14. In consequence the privilege created by section 10 is not and was not intended to be absolute. Its application requires in every case a fact sensitive balancing test between the need for a journalist source to be identified and the desirability of preserving the ability of the press to protect its sources and to function and thus its freedom. The Act makes clear the circumstances in which it may not operate. In the case of the prevention of disorder and

crime, the words are lifted directly from the text of the ECHR. But in addition the "interests of justice" cover the right of individuals such as the Petitioner to seek and obtain redress through the courts for tortious or criminal acts that may have been done to them, the "rights and freedoms of others" referred to in the ECHR.

15. Forgery, contrary to the Forgery and Counterfeiting Act 1981, is a serious offence. The creation of the forged COLP report was plainly done with the intention of damaging the Petitioner and criminal and civil liability will attach to its creator and any person who makes use of it when he knows it to be false with the intention of inducing an act to another's prejudice. As such, a prima facie case for its commission by Forged Report Distributor 1 and, if he exists, Forged Report Distributor 2 are plainly made out. Establishing the identity of Forged Distributor 1 is therefore critical to taking any investigation into the forgery forward and there is on the evidence in this case no other viable route to doing this. There are in addition other possible criminal offences made out against them. These include offences under the Fraud Act 2006, for false representations designed to cause loss to the Petitioner. While most prosecutions in England and Wales are brought by the Crown, there is nothing to prevent an individual bringing a private prosecution if no public prosecution takes place. But I am of the opinion that if the name of Forged Distributor 1 becomes available there would be a strong public interest in a criminal investigation taking place into how he came into possession of a forged document purporting to originate from the Police. I would expect such an investigation and a prosecution to occur thereafter if the investigation meets the evidential threshold for one.

16. As Attorney General, I would have been extremely concerned at any suggestion that the operation of Section 10 of the Act was being used to prevent a criminal investigation and possible prosecution which related not just to a breach of confidentiality in relation to a source supplying information to a journalist but to the creation of a false and

fraudulent narrative designed to do harm to others, through the supply of forged documents to journalists. It is noteworthy that the Amici Brief makes no attempt whatsoever to examine the issue on its facts. It simply sets out a justifying narrative for journalistic privilege on the basis that "journalists consistently rely on …confidential sources to break news stories that serve the public interest".  *See* Amici Brief, at 2.

17. While journalistic freedom is very important, the public interest in preventing serious crime is of great importance too. Prevention in this context includes bringing to justice the perpetrators of serious crime, as without it an environment of impunity is created for criminals. Seeing that the evidence available in this case supports the view that the Petitioner has been the victim of a deliberate attempt to damage him by the creation of a false and fraudulent narrative based on a forged document, claimed to originate from a public authority with responsibility for law enforcement, I would expect the English courts to give this very considerable weight in the balancing exercise they carried out, contrary to the impression conveyed in the Amici Brief.

18. In contrast, the public interest arguments for journalistic privilege to apply are weak. The Petitioner is seeking to argue for a right of non disclosure of a source, when he was aware before using that source for his article that the document he had received from the source could not be relied upon as a source of true information. It is difficult to see how this can be reconciled with the principals and the rules of journalistic ethics which underpin the public interest rationale behind giving journalists privileges in protecting their sources.

19. Case law available emphasizes the case specific nature of the exercise that a court will carry out and that the detailed facts of this case are highly relevant . The jurisprudence of the European Court of Human Rights in *Goodwin v UK* 17488/90 22 EurCtHR 123, (March 27 1996), which remains the key authority on how the balancing exercise needs to be approached, established that the receipt of a confidential internal

company document damaging to the company was not good grounds for requiring disclosure of the source as only "an overriding requirement in the public interest" could do so. A clear case of necessity for disclosure must be established.

20. Such an example of necessity can be seen in *Ashworth Hospital Authority v MGN Ltd* [2002] UKHL 29. There the Defendant newspaper published an article on a mass murderer held in a special hospital, using details and extracts from his confidential medical file that had come from an intermediary who had received it from a source who was likely to be a member of staff of the Claimant. The House of Lords, then the UKs highest court, upheld the order for the disclosure of the identity of the intermediary, notwithstanding that some of the information had already been put into the public domain by the mass murderer himself. It held that the breach of confidence in confidential medical information being leaked, justified the Claimant in establishing its source. The newspaper was on notice that the information had been obtained in breach of that duty of confidence.

21. This is what we have here. The present case can also readily be distinguished from the facts in Goodwin, which concerned the unsolicited receipt by a journalist of confidential material in relation to a company and where an injunction had been granted to prevent its publication. The order to divulge the identity of the source was seen as unnecessary and therefore in breach of Article 10. In contrast in this case, if no order were made it becomes possible for any forger or fraudster to place in the public domain material highly damaging to others by the intermediary of a complaisant journalist, especially when the journalist knew, or should have known, that the information he was publishing was from a forged document. In this way, an important aspect of the rule of law is undermined by the ability of a fraudster to use an unsuspecting journalist for his or her own ends.

22. It is important to emphasise that the English courts are not, in any event bound by the jurisprudence of the European Court. They will seek to apply the principles the

European Court identifies, but they will exercise their own discretion on how Section 10 of the Act should be applied.

23.      There is no sense in which it can be argued that journalistic privilege must prevail, as the Amici brief suggests. For the above reasons, I believe that an English court would on the facts of this case order disclosure of the identity of Forged Distributor 1 on grounds of both public interest and necessity. It is in the public interest for the source to be disclosed to promote the rule of law and bring to justice the perpetrators of a fraud. And it is a matter of necessity because Mr. Pishevar has no reasonable alternative method by which to seek the information.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 6th day of January, 2020.

_____
RT Hon. Dominic Grieve QC