**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APPLICATION OF SHERVIN PISHEVAR FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:19-mc-00503-RA |

**DECLARATION OF DIANA ASCHER**

I, Diana Ascher, hereby declare as follows:

1.  I submit this declaration in support of Petitioner's Memorandum of Law In Response to Brief of Amici Curiae Reporters Committee Freedom of the Press and Media Legal Defence Initiative ("Amici Brief") and in Support Of Petitioner's Application And Petition for An Order To Conduct Discovery For Use In Foreign Proceedings Pursuant To 28 U.S.C. §1782 (the "1782 Application").

2.  I have been retained by Petitioner to opine on various aspects of data and journalism ethics in response to the Amici Brief. Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge and research; (b) my review of relevant documents, including the Amici Brief and other memorandum of law and supporting documents filed in this matter; and (e) information supplied to me by the Petitioner or its officers, directors, and employees, or professionals retained by them.

3.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the 1782 Application and accompanying memorandum of law.

**I.      BACKGROUND AND QUALIFICATIONS**

4.  I am an educator, practitioner, researcher, and scholar who focuses on information, technology, and decision making in organizations. My interdisciplinary research interests draw from both academic and professional work in a variety of fields, including

financial communication, journalism, and public policy.

5.      As director of the Information Studies Research Lab (IS Lab) at UCLA, I develop resources and programming to support the curriculum of the Department of Information Studies, and conduct research on the effects of technology on information practice.

6.      As founder of the Information Ethics & Equity Institute (IEEI), I develop tailored, accredited continuing education and training programs for data management architectures and practices; designing for equity, diversity, and inclusion; data ethics; intersectionality; and workforce development across industry sectors, customer segments, and media channels.

7.      I am also the Senior Advisor for Data Ethics at the Enterprise Data Management Council and President of the Society of Policy Scientists. I am also a non-resident Fellow of the Center for International Trade & Security (CITS) at the University of Georgia and a non-resident Scholar in the Diversity Scholars Network of the National Center for Institutional Diversity (NCID) at the University of Michigan. I also sit on the steering committee of the Data Science Foundation.

8.      I earned a Ph.D. from the Department of Information Studies in the Graduate School of Education & Information Studies at the University of California, Los Angeles; an M.B.A. from the Peter F. Drucker Graduate School of Management at Claremont Graduate University; and a B.A. in Public Policy with concentrations in journalism and international policy from Duke University as a recipient of the Benjamin N. Duke Leadership Scholarship.

9.      I have taught numerous classes over the course of my career in the areas of data, ethics, information, journalism, management, and policy. I have conducted research and published articles in each of these fields.

10.     Prior to my academic career, I was a journalist and editor for several news

organizations, including *Bloomberg LP, the Charlotte News & Observer, the Durham Herald Sun,* and *WTVD News,* among others. In 1989, I won the *Durham Herald-Sun* Front Page Award in Journalism.

      11.     I attach my CV as **Exhibit 1**.

## II.    JOURNALISM ETHICS AND THE FOURTH ESTATE

      12.     Journalism is considered one of the four pillars of American democracy, providing a crucial check on the three branches of government. Often referred to as the "Fourth Estate," journalism's watchdog role is as engrained in American culture as football and the white picket fence. Throughout history, investigative journalists have been celebrated as all-American, hard-working heroes in popular culture.

      13.     From a virtue, or character-based, ethical perspective, journalists often aspire to shine a light on corruption and abuse of power. One iconic example: Carl Bernstein and Bob Woodward's *Washington Post* Watergate reporting, which relied heavily on information provided by "Deep Throat," among other anonymous government insiders, exposed corruption at the highest levels of the U.S. Government. Deep Throat remained anonymous until his identity as former FBI official Mark Felt was revealed in 2005.

      14.     There is widespread consensus that Bernstein and Woodward's protection of their confidential source was merited. The primary mandate of a news organization is to alleviate the burden on citizens of searching for trustworthy information, and the information provided by Deep Throat was related to corruption in the highest office of the government, so the information was deemed in the public interest. Furthermore, the information could not be obtained by the reporters elsewhere. Few would question that the situation met the necessary preconditions for extending an offer of identity protection.

      15.     Even so, there are some critics who maintain that Felt was manipulating the

media as part of a personal vendetta.[1] Thus, even the iconic cases can be tricky. It is important that investigative journalists recognize the potential for manipulation, and rely not only on virtue ethics—even Woodward and Bernstein had to apply news judgment—but also on deontological ethics.

16.     From a deontological, or rules-based, ethical perspective, journalists develop their news judgment in part by adhering to Codes of Ethics, which are supplemented by news organizations' policies, style guides, and work practices. For example, the Society of Professional Journalists (SPJ) provides its members with the SPJ Code of Ethics, which "is a statement of abiding principles supported by additional explanation and position papers (at spj.org) that address changing journalistic practices."[2] The preamble of the SJP Code of Ethics explains that the organization's members "believe that public enlightenment is the forerunner of justice and the foundation of democracy. Ethical journalism strives to ensure the free exchange of information that is accurate, fair and thorough. An ethical journalist acts with integrity. The Society declares these four principles as the foundation of ethical journalism and encourages their use in its practice by all people in all media."[3] I have included a copy of the SPJ Code of Ethics as **Exhibit 2**. The four principles elaborated in the document are:

        A.  Seek truth and report it.
        B.  Minimize harm.
        C.  Act independently.
        D.  Be accountable and transparent.

17.     In my career, I have been involved with the crafting of numerous Codes of Ethics. I also have worked as a reporter and editor, adhering to Codes of Ethics at several news organizations. In addition, my academic research on information practices of culturally

---

[1] Friedman, 2008.  A complete list of my references is annexed to this declaration as Annex A.

[2] SPJ Code of Ethics, N. D.

[3] Ibid.

distinct news organizations has entailed analysis of many Codes of Ethics. The four principles of the SPJ Code of Ethics are broadly representative of the approach to ethical journalism taken by all of the news organizations for which I have worked and/or researched.

18.    A journalistic Code of Ethics serves a variety of purposes. Primary among these is to provide reporters with guidelines for their conduct on behalf of the news organization. These guidelines assist reporters with the development of news judgment that is aligned with the aims of the organization. Many news organizations provide detailed guidance to reporters on news judgment and interactions with sources. If journalism were a religion, *The Bloomberg Way: A Guide for Reporters and Editors* would be its bible. I have been unable to obtain a copy of *Fast Company's* Code of Ethics, nor its editorial policy, to examine the organization's stance on confidential sources, but I present a selection of commentary on protection of confidential sources from several news organizations as **Exhibit 3**. I conducted a comparative analysis of various versions of the article in question and compared these to coverage of the same story by *Fast Company's* competitors, which I present in Section IV below.

### III.    THE EVOLUTION OF NEWS JUDGMENT

19.    News judgment is a continually evolving skill. It evolves perpetually for a few reasons. *First*, societal values change over time, which means that the context in which editorial decisions are made is dynamic. Though a fairly general set of news values was codified in the 20th century, the social movements of the 1960s and 1970s redirected focus to issues of social justice, corporate greed, and political misconduct. The civil rights movement exposed a predominantly white and male news industry to minority communities and injustices that had not been well covered previously, or perhaps, at all. The women's rights movement brought debates about abortion, birth control, gender equality, and sexuality to the forefront of news coverage. These issues catalyzed modifications to news organizations'

Codes of Ethics.

20.     *Second*, information technology changes over time, which means that the ways in which people gather information is dynamic. By the turn of the 21st century, technology advanced new means of both freedom of expression and accountability. Further, the typical lag between innovation and regulation increased as governments tried to navigate the complexity of new technologies and their implications for civil and political rights.

21.     Necessarily, the dynamism of both the societal and technological contexts requires iterative review and updating of these foundational Codes of Ethics. The Fourth Estate's mandate to serve the public interest has been complicated by several factors relevant to news judgment, investigative journalism, and source confidentiality, which should be reflected in news organizations' Codes of Ethics and standards of practice.

### A.     *Technological Innovation Has Changed News Reporting*

22.     American journalism is regarded as a model of systematic management of bias, accomplished by enacting a strict Code of Ethics, akin to the Hippocratic oath or the Pledge of Allegiance. "News coverage that provides truthful and comprehensive accounts of events fosters the conditions that societies need to thrive economically and politically. And accurate media coverage enables individuals to make sound judgments and gain control over their lives."[4]

23.     News values act as decision rules for the news industry, so the public can make sound decisions based on faithful recounting of events and communication of the myriad ways in which those events may affect the lives of the citizenry today, and in the future. Over time, news information practices that enact these decision rules become routine and come to symbolize the values associated with professional journalism.

24.     Technology has shaped public conceptualizations of reality throughout the

---

[4] Gardner, et al., 2002, pp. 125-126

evolution of journalism. With the advent of each new technological enhancement, the press and the public have updated their notions of objectivity and the role of the Fourth Estate. For example, during the Civil War, photojournalism added a sense of realism to news reports, conveying the brutality of the war through images that evoked visceral reactions among the American public.[5]

25.    At the time of the introduction of each of new technology, the cost to produce forgeries was prohibitive enough that the veracity of new media formats was rarely called into question. However, the sensationalism we see today in the era of "fake news" has manifested in other media formats throughout history.

26.    Technological advances have created a variety of benefits and harms affecting how the citizenry accesses trustworthy information in the digital news landscape. Among the benefits of internet-enabled communication technologies (ICTs) are greater access to information among a more diverse population of news consumers, exposure to multiple sources of information, and the increased ability of the citizen journalist to contribute to the discourse.

27.    With each technological innovation—including photography, telegraphy, radio, television, and the internet—American journalism introduced alternate perspectives on which American public opinion would be based, and formalized the adoption of new formats as standards for the evaluation of truth in reporting in a new spatiotemporal context. Information practices at modern-era news organizations retain ties to this pattern through consistent adherence to news values that coalesced during the 1960s and 1970s.

**B.    *Yellow Journalism Exists In New Forms In Today's Digital Age***

28.    Yellow journalism is an American term for news that is presented to the public using eye-catching headlines and other editorial mechanisms to attract reader attention and

_____

[5] Ascher, 2017

increase sales.

29.     The roots of yellow journalism can be found in Pulitzer's recognition that prominent newspapers catered to wealthy white society, to the exclusion of minority populations, including women and African-Americans. Pulitzer entered the New York newspaper market with *The New York World,* setting the price at one penny, which made the publication more affordable for under-served minorities. However, unlike many of the entertaining "penny press" publications, Pulitzer's *World* aimed to provide the public with investigative reporting and appropriate context. Aware that his target market was pressed for time and had many newspapers from which to choose, Pulitzer used various design and editorial techniques to pique customer interest. These innovations included banner headlines, hyperbolic terminology, and copious use of imagery.[6]

30.     Critiques by New York's more conservative newspapers coined the stigmatic term, yellow journalism.[7]  Yellow journalism "advocated an ethos of activist journalism, yet did so in bursts of unabashed self-adulation."[8] Thus, the investigative reporting that blossomed in the 20th century grew out of the independent, locally focused activist reporting that was spurned by traditional journalism in the previous era.

31.     Using terms and images that attract the attention of the "nanosecond" society, a new industry has arisen as a 21st-century form of yellow journalism—what I call the *new yellow journalism*—in two forms. The first is called "clickbait." News organizations include clickbait on their websites to generate revenue because they haven't found a viable business model for the digital era. Typically, a section runs alongside the hard news content with a relatively obscure attribution line. Sensational headlines and images leverage trust in the

---

[6] Campbell, 2003

[7] Whyte, 2008; Yellow journalism, 2013

[8] Campbell, 2003

news authority to lure readers to other websites with the hope of generating revenue. Of course, these "infotainment" items find their way to social media platforms along with the hard news stories produced by news organizations.

32. The second kind of new yellow journalism we see today is harder to detect. *Algorithmic sensationalism* is a process that generates "news" that is driven not by newsworthiness, but by data-driven algorithms that determine how, when, where, and to whom articles are distributed online.

33. Automated distribution of news stories through social media has greater influence on public opinion than one might first anticipate. Part of the problem facing news organizations is that the metrics being used to evaluate performance are not good measures of a news organization's success in meeting the traditional objectives of journalism. For example, when success is quantified according to number of "likes," the standard for "good" journalism shifts from presenting relatively unbiased and/or multiple perspectives on current events to redistributing content that is popular among those who have been exposed to it. But just because something is popular doesn't mean it is valuable in terms of newsworthiness. The reliance on measures of popularity for news valuation not only affects the news on social media networks, but it also extends to other media channels.

34. Another factor that contributes to the new yellow journalism is the use of algorithms to automate headlines (and, sometimes, content) of articles being distributed via social media. The stories that perform well on social media are those that grab readers' attention, often with hyperbolic terms in their headlines. In addition, the algorithmically generated results of searches for information using search engines, such as Google, Bing, and DuckDuckGo, differ, depending on who is seeking the information.

35. It is important to note the tremendous propensity for commercial search engines and social media networks to perpetuate the biased assumptions inherent in the

structure of the classification systems underlying their technology.  Certain forms of biased information (e.g., hate speech, propagandistic rhetoric, and fake news) are privileged in these algorithms to the exclusion of potentially counter-balancing types.

C.    *Social Media Values Instantaneity, Not Investigation*

36.    Today, social media platforms, search algorithms, and user-generated content are integral to news organizations' business models.  Thus, the Fourth Estate's mandate—to alleviate the burden placed on citizens to obtain accurate, reliable, and relevant information to aid their decision making—takes on additional layers of responsibility.

37.    As the means by which 62% of American adults access news,[9] social media networks wield unprecedented power in the shaping of public opinion.  "Those who work in the politically relevant sectors of the media system (i.e., reporters, columnists, editors, directors, producers, and publishers) cannot but exert power, because they select and process politically relevant content and thus intervene in both the formation of public opinions and the distribution of influential interests."[10]  Even as large information portals like Google and Facebook continue to deny their role as media companies, some 44% of Americans use Facebook as their primary source of news, according to a recent Pew study.[11]

38.    There are a host of negative externalities for national cultures, which may affect politics, economics, and social and everyday life.[12] One of the most dangerous outcomes of the digital era is that the financial environment of media industries rewards instantaneity, not investigation.

D.    *Consolidated Media Industry Now Values Immediacy Over Accuracy*

39.    Massive consolidation in the media industry has prioritized the bottom line

---

[9] Gottfried & Schearer, 2016

[10] Habermas, 2006, p. 419

[11] Pew, 2016

[12] Kellner, 2004

over the public interest in a fashion not dissimilar to the commercial journalism of the late 19th and early 20th century.  The shift—from a dynastic model in which a handful of families ran news organizations with a long-term focus on engendering trust to a model in which private equity firms consolidate media entities and focus on short-term profitability—has gutted local investigative reporter ranks and placed undue emphasis on immediacy, rather than accuracy.  The "news deserts" that we see today are a direct result of this change.  When there is no news coverage at the local level, bad actors run rampant.

40.     Whereas previous mergers and acquisitions in journalism tended to be among industry veterans, today 47% of new owners of news companies have no experience in or ties to journalism.  Instead, "a new media baron has emerged—investment entities now own a growing number of newspapers across the country."[13]

41.     This type of consolidation in the news industry is of grave concern because the short-term nature of these private equity investments disrupts the balance between the tenuous financial-solvency and public-interest mandates of the Fourth Estate.  The potential for abuse here cannot be overstated. When a newspaper is accountable to a private equity firm for quarterly earnings, the merits of in-depth investigative reporting and communication of the long-term effects of local decisions on the community stand little chance of being appreciated.

42.     What this means, ultimately, is that news organizations must develop new sources of revenue and restructure their business models to compete on digital media platforms.  And they must do so in a manner that will underwrite the types of investigative reporting that are necessary for democracy.  This is hardest for the small, local news organizations that need it the most.  "The pressure to copy tried-and-true formulas engenders an aversion to creative risk taking and, inevitably, to pat and superficial coverage of news

---

[13] Abernathy, 2016, p. 67

events."[14]

43.    Thus, the evolution of news organizations—from traditional legacy businesses with long-term strategic goals to one of many private equity firm investments focused on short-term returns—creates a conflict between the instrumental obligations that made American journalism the quintessential model of democratic free speech.

E.    *Citizen Journalism Places Increasing Value On Instantaneity, Too*

44.    Social networks' low barriers to entry enabled the rise of citizen journalism, increasing competition and obscuring indicators of quality news online. In addition to short-term financial decision making, the media landscape is teeming with new entrants. Citizen journalism is the non-professional reporting of news. Sometimes referred to as public, participatory, or social journalism, it occurs when those without professional journalism training make use of technology and global distribution channels to create, augment, or verify news information. "When the people formerly known as the audience employ the press tools they have in their possession to inform one another, that's citizen journalism."[15]

45.    In place of coverage produced by trained journalists upholding a Code of Ethics, today's local news often is provided by citizen journalists.  It is common practice for news organizations to leverage citizen journalists in their reporting.  For example, television newscasts often reference Twitter trending topics, and display tweets and other media provided by citizens.

46.    The use of social media to report on political upheaval, natural disasters, and other breaking news events has been heralded widely, particularly in the cases of the revolutions in Egypt, Iran, Tunisia, and the Ukraine.  Often the term citizen journalist connotes activism in reporting information that empowered traditional media outlets do not

---

[14] Gardner et al., 2002, pp. 132-133

[15] Rosen, 2008, p. 1

broadcast, or divulging corrupt or inappropriate behavior by powerful entities. Citizen journalists earn trust by providing eyewitness accounts unsullied by financial and political pressures.

47.     Since citizen journalists are not trained professionally to uphold Codes of Ethics associated with American journalism (or, for that matter, even in the basic procedures of news writing and source verification), their social media posts run the gamut from completely fabricated baloney to in-depth, substantiated research findings. Social networks have not provided a feasible system for judging the merits of sound reporting.

48.     Of course, while it is beneficial to have multiple perspectives and accounts of a news event available to contribute to news coverage, there are significant risks in this approach. These dangers run the gamut from inaccurate, incomplete, and/or imbalanced reporting (misinformation) to fraudulent accounts aimed at misleading the public (disinformation). Forgeries, misattributions, and unfounded accusations abound on social media.

49.     The newest form of disinformation comes in the form of the deepfake video, in which a person in an existing image or video is replaced with someone else's likeness using artificial neural networks. While it may be entertaining to see Nicholas Cage's face superimposed on various film characters, there are significant potential harms associated with this technology. For example, in May 2019, President Trump tweeted a deepfake video depicting Speaker of the House Nancy Pelosi apparently slurring her speech. He captioned the deepfake, "PELOSI STAMMERS THROUGH NEWS CONFERENCE." However, on comparison of the deepfake with the original, it became clear that the speed of the video had been altered. Recently, open-source and commercial apps for producing deepfakes have made this form of disinformation broadly accessible and difficult to detect. Some researchers warn that it will be impossible to distinguish deepfakes from genuine videos by the Spring of

2020, given the rapid pace of advances in artificial intelligence and computer graphics.[16]

50.     ICT innovation also has contributed to the expectation of instantaneity among consumers of online news.  Social media networks dramatically decreased the spatiotemporal constraints on information exchange, ushering in an era of news reporting sometimes called the "nanosecond news cycle."  Since so many are turning to social media networks as a primary news source, and since they do so via mobile phones at all times of the day, news organizations have changed their information practices to accommodate unprecedented demand. The public has come to expect instantaneous reporting.

51.     When shots are fired at a Florida airport, the Twitterverse learns about it within seconds, as a bystander citizen journalist posts her perspective of the unfolding events. This happens long before a reporter can be dispatched to cover the news, and certainly before any verification or fact checking can occur.  Thus, news organizations must decide whether to post unconfirmed news reports as they are available, or to wait for traditional reporting practices to ensure their Codes of Ethics are being upheld.  It is for this reason that local television news stations report on what topics are trending on social media—a hedge against missing out on early coverage, but distancing the organization from accountability should the tweets end up being inaccurate.

**F.     The Evolution In News Has Led To More Propaganda And Fake News**

52.     These features of news evolution may be harmful to society if exploited, and we have seen plenty of such societal harms. Today's media climate, in which measures of news popularity motivate sensationalist headlines and little depth, is not conducive to the kind of news judgment—or of the kinds of personnel resources and temporal horizons— required for groundbreaking news coverage. Instead, news is released in snippets, as quickly as possible, without contextualization.  These developments have undermined the public's

---

[16] Baram, 2019; Stankiewicz, 2019

trust in journalism, particularly in news distributed through social media networks. "Even when the originator is known without doubt, queries of the veracity and reliability of what is presented run unbroken from the propaganda pamphlets of seventeenth century wars and religious strife to the web-cams of the politicians of the twenty-first century."[17]

53.    A prominent case in point: Cambridge Analytica's "psychographic" analyses, combined with the firm's questionable access to granular Facebook user data sans user consent and its exploitation of the tendency for social media and news organization algorithms to amplify content with inflammatory headlines—what I call *algorithmic sensationalism*—flooded the newsfeeds of target populations with disinformation that helped to elect our current President to the White House. Numerous firms offer "research services" aimed at exploiting digital technology to amplify the reach and perceived trustworthiness of disinformation to achieve a variety of business and personal aims. Aside from expensive firms like Cambridge Analytica, in our current technological context, bad actors also avail themselves of hackers on the Dark Web to disseminate disinformation.

54.    Unchecked by a legal system that is struggling to regulate social media without infringing on civil rights, and fueled by ideologies that appear to be steeped in racist, sexist, and homophobic hatred, fake news has overrun the public sphere. The dire financial situation in the media sector, combined with the special role that the media plays in democratic society, has created unprecedented vulnerabilities to misuse and abuse of information.

### G.    *Confidentiality In Reporting Has Had To Evolve, Too*

55.    All of these developments increase the burden on investigative journalists to fulfill their Fourth Estate responsibilities to the public. In addition to the nanosecond news cycle, citizen journalism, and expectations of instantaneity, another outcome of these

---

[17] Bawden & Robinson, 2009, p. 182

developments is that it is more difficult to protect the identity of a confidential source in the digital era.

56.      One of the most important tenets of journalistic practice is the reporter's commitment to protecting the confidentiality of anonymous sources.  To better understand this phenomenon, we must look at the conditions under which this practice arose, and then examine how these conditions have evolved in the digital news era.

57.      The reason reporters offer confidentiality to sources springs from a belief that citizens will be unlikely to provide vital information in the public interest to reporters if they are not protected from the consequences of having provided the information. Indeed, "Deep Throat," aka Mr. Felt, may not have come forward with information about Nixon without the promise of confidentiality.

58.      But confidentiality should be the exception rather than the rule.  The Society of Professional Journalists cautions its members "to be very careful about promising anonymity. In some settings — Washington, D.C., in particular — it's almost impossible to get anyone to talk without making such a promise.  But in other areas of the country, where bureaucracy and politics are not so entrenched, news executives insist that promising anonymity should be used only as a last resort, not to break the ice at the beginning of an interview. *The source of a leak sometimes is even more interesting than the leaked information, because it may reveal a motive that is less than the epitome of integrity*."[18]

59.      Recent studies on confidential source practices in news organizations "suggest that journalists and media organizations can do more to ameliorate [issues arising from using confidential sources] by more clearly defining the scope of the confidentiality obligation and

---

[18] Brown, N. D.b.

reducing the unnecessary creation of such obligations."[19]

60.    According to the Ethics Committee of the SPJ, "being too free with unconditional promises of anonymity" creates risk for news organizations.  An increasing number of mainstream media outlets is adopting more stringent policy on confidential sources. In addition, some news organizations advise their reporters to make sources aware of the possibility that an agreement to protect their identities may be revisited under certain circumstances. "One of those times may be when it becomes apparent that a source has lied, or has cynically attempted to manipulate a reporter."[20]  So reporters should be selective about the commitment to protect a source's identity.  ***It should be a last-resort incentive to elicit information that cannot be obtained elsewhere, and which is vital to the public interest.***

61.    Given this new landscape, journalists must hold themselves not only to the standards of their organizations' Codes of Ethics, but also to their own moral integrity. Confidentiality should be the exception, not the rule. Recent interviews of news editors reveal that these expectations are already in place, yet they seem to be unenforced. For a collection of statements on best practices for journalistic confidentiality from news organizations, see **Exhibit 3.**

### H.  *#MeToo And Its Effects On Reporting*

62.    An additional relevant consideration is Fast Company's reporting on the #MeToo movement. "The combination of #MeToo's shift to the outing of specific wrongdoers, investigative journalism, and enhanced public scrutiny has led to the firing, suspension, or resignation of high-level and high-profile individuals across industries."[21]

---

[19] Fernandez, 2015, p. 316

[20] Brown, N. D.a.

[21] Wexler, et al., 2019, p. 52.

63.     As mentioned in a 2018 Fast Company article, the #MeToo movement has been criticized due to its "lack of a clear path and procedures by which an accused can successfully contest allegations, judgment by the public rather than by a jury or other independent decision-maker, the risk of false positives, and the potential for disproportionate consequences that are often framed as punishments."[22]

64.     As Fast Company has reported, the "one-size-fits-all, fire-aim-ready approach to dealing with claims of offense–whatever the offense may be–" creates an uncomfortable situation for many. Even though conduct identified via #MeToo "encompasses a range of behaviors that fall along a spectrum and merit a range of different consequences,"[23] there is significant pressure to acknowledge #MeToo victims' experiences as a signal of community support.[24]

65.     Further, if the scuttlebutt among reporters was that "Shervin is the next to go down," Mr. Baram was "primed" to accept negative information about Mr. Pishevar. In other words, if Mr. Baram believed that Mr. Pishevar was going to be the next high-profile technology investor to face intense #MeToo scrutiny, any negative information that found its way to Mr. Baram may have been accorded greater weight or less scrutiny than it should. This is an example of confirmation bias, and it's tough to recognize.

## IV.    GIVEN RAMPANT DISINFORMATION, PROTECTING CONFIDENTIAL SOURCES NEED NOT, AND SHOULD NOT, BE AS RIGOROUSLY ENFORCED HERE

66.     Anonymity is necessary to fulfill the mandate of the Fourth Estate in some cases. That said, given the recent exploitation of digital technology and the evident bad actors

---

[22] LaPorte, 2018

[23] Wexler, et al., 2019, p. 72

[24] Wexler, et al., 2019, p. 72.

exploiting it, news judgment must take into account the pervasive abuse of technology to influence public opinion through concerted disinformation campaigns.

67.     It is not uncommon—though, in my opinion, it is unwise[25]—for reporters to define their professional identities based on their records of confidential source protection. As Mr. Baram notes in his affidavit, he "often rel[ies] on confidential sources who speak to [him] on the condition of anonymity.  [His] ability to report on matters of public interest depends on [his] ability to safeguard the identities of [his] sources and the confidentiality of the information that they provide.  [He has] never revealed a confidential source."  But that's the wrong metric.  The best measure of successful journalism is serving the public interest without the need for confidentiality.

68.     Every effort should be made to serve the public interest without anonymous sources.  If this cannot be done, it is a best practice to provide contextualizing information about an anonymous source, as well as to explain why it is in the public interest to report the information provided by the confidential source without revealing the source's identity.  Unfortunately, this practice is infrequently enforced.

69.     Since every effort should be made to report the news without relying on confidential sources, and since the proliferation of fake news creates a need for greater scrutiny of the potential motives for requests for anonymity, I would expect journalists to include few confidential sources in their reporting.

70.     I analyzed 102 articles I retrieved from the Fast Company website authored by Mr. Baram from October 31, 2018 through June 29, 2018. Out of those, I found 36 references to unnamed sources in 18 of the 102 articles.  Just under two thirds of these references

---

[25] It would be better for reporters to pride themselves on their ability to elicit fair, accurate, verifiable, newsworthy information in the public interest without the need for protecting confidentiality.  If a reporter's claim to fame is never having revealed a source, I suspect the reporter is promising confidentiality when it should not be promised.  The context, including the identity of sources, is vital information for decision making by the public.

pertained to spokespeople,[26] while 14 described unnamed sources who were not
spokespeople.  These 14 unnamed sources were referred to as government or industry
sources, or sources "close to the company" or "close to the prosecutor's office."  None of the
unnamed sources were described as having requested anonymity. In my experience, while
Mr. Baram could have provided more context as to how these sources are "close" to the
relevant entities, his use of confidential sources does not appear to be highly unusual.
However, in the article at issue, Mr. Baram does a disservice to the public by providing no
context whatsoever for the origin of the report on which his article is based. *This is
surprising, especially since he knew there were questions about the authenticity of the report.*

71.    In the articles referring to the Plaintiff, Mr. Baram made no reference to the
confidential source who provided him with the forged report.  However, information gleaned
from the phony document is included, particularly in the story dated November 8, 2017,
"'Smear Campaign' Or Not, Tech Investor Shervin Pishevar Really Was Arrested Earlier
This Year."

72.    Though there is an editor's note indicating that the article had been updated in
light of the revelation that the report was fabricated, Fast Company did less to alert the public
about the forged document than most other news outlets covering the story.  For example,
Forbes updated its article by adding a more detailed editor's note, removing the details
gleaned from the forged report, and demonstrating independent verification, though from an
unnamed source:

---

[26] By spokespeople, I refer to corporate representatives identified in Mr. Baram's articles as spokesman
or spokeswoman.

**By Alex Konrad, Parmy Olson, Biz Carson, Clare O'Connor and Tom Fox-Brewster**

[Editor's note: An earlier version of this story included details from a police report obtained by Forbes. On November 14, 2017, the City of London Police told *Forbes* that the report is a forgery and accordingly Forbes has removed any details which could not be independently verified.]

As noted above, an earlier version of this story cited details from a police report. As the city of London Police determined the report to be a forgery, we have removed the relevant details from the report which could not be independently verified.

It's through the private elevator and entrance of the hotel's penthouse that police walked Pishevar under detention, keeping him largely out of sight, a source with knowledge of the arrest says.

73.    Fast Company kept many details drawn from the forged report and did not mention independent verification (emphasis added):

BY MARCUS BARAM   7 MINUTE READ

EDITOR'S NOTE:  On Monday, we learned that a police report described in this story has been proven false by the City of London police.

The payoff claim is false, according to Pishevar's lawsuit, but it doesn't dispute the sexual assault accusation itself. That's because Pishevar was indeed arrested last May on suspicion of rape at the Ned hotel in London, according to his crisis management expert and a copy of a police report seen by *Fast Company*, though he was never charged with any crime.

A City of London police report on the arrest, providing details about what happened that night, has been shared with some reporters, though its authenticity has not been verified and a court injunction filed by his lawyers in the United Kingdom ensured that the incident received little press attention in the U.K. (UPDATE: As noted above, this report has been proven to be false, according to a letter from the City of London comptroller.)

Pishevar was staying in the penthouse suite at the posh Ned hotel in London on May 27, when a young woman walked in to the nearby Bishopsgate police station and alleged that she had been raped, according to the report. Several police officers went to the hotel, arrested Pishevar, and interviewed and examined the alleged victim, per the report. She was attended to by a sexual crime unit, paramedics, and a medical practitioner, and officers searched Pishevar's suite.

In the end, the police declined to bring charges, did not refer it for prosecution, and the case remains closed. Per a City of London police spokesperson: "The investigation was completed and reviewed. There was insufficient evidence to provide a realistic prospect of conviction therefore no further action was taken against the suspect." The incident was handled by the city's "gold command," the highest level of police and emergency service officials, due to Pishevar's high profile, according to the report.

74.     Mr. Baram states in his affidavit that all of the information provided by the Confidential Source "was offered on the condition that [Baram] would not disclose his identity." Not only is it not always necessary to conduct an entire interview off the record, but also some news organizations encourage their reporters to make clear to their sources that

confidentiality is contingent on authenticity,[27] which, of course, did not occur here. Furthermore, Mr. Baram has not provided a reason for keeping the identity of his source confidential other than the fact that he promised to do so. As mentioned previously, in my experience and based on the SJR Code of Ethics, this is not a best practice. In order to properly weigh the trustworthiness of the information provided by the source, the public must have a sense of the source's true knowledge.

75.     I have no reason to doubt that Mr. Baram adhered to Fast Company's standard protocols in reporting on this topic. And, indeed, Mr. Baram demonstrated his investigation beyond the forged report by noting that he had spoken with "[a]t least half a dozen former associates of Pishevar, including some who say they dislike him" who never saw him behave inappropriately in professional or social settings, and that he had searched court records in five counties in California and Maryland, without any record of a criminal case.

76.     Most perplexing, however, is that all of the reporters covering this beat haven't pursued the source of the forged document. As noted above, in some cases the source of a leak can be more interesting than the leaked information, because it may reveal a motive that is less than the epitome of integrity. That is exactly the situation here and the lack of any further investigation of the forged report once it was confirmed to be false suggests that there is more going on here than has been revealed by the media.

77.     This is confirmed by the timeline of events. On the day that Mr. Baram receives the first bit of information about Mr. Pishevar, in July 2017, Mr. Baram does not have anyone who will go on the record, and no story runs. The next day, Mr. Baram learns that Mr. Pishevar "obtained a gag order preventing English newspaper *The Sun* from covering his arrest at a reported cost of £100,000" in June 2017, but still did not run any story. Come

---

[27] See Exhibit 3, especially excerpts from Associated Press Media Editors, Denver Post, Detroit Free Press, Gannett, Los Angeles Times.

September 2017, Mr. Baram meets up with his Source, who provides a thumb drive containing an image of a purported police report. Mr. Baram attempts to verify the report by communicating with the City of London Police via email and does not run any story. On October 20, 2017, Mr. Baram receives a reply from CoLP, stating that the report "did not appear to be authentic." Still he did not run a story.  I understand that CoLP further confirmed to Mr. Baram and others that the report was a fake on October 24 via email, too. Plaintiff filed suit against opposition research firm Definers Public Affairs on November 6, 2017, and Mr. Baram covered the filing. On November 7, Mr. Baram contacted CoLP again, and, again, CoLP confirmed that the investigation remained closed and that they had no further comment. The *next day,* Mr. Baram filed the article that Petitioner labels the "Fake News Article," containing several details that derived only from the Forged Police Report, despite Mr. Baram's knowledge that there is at least some doubt as to the authenticity of the report.

78.     On determining that the authenticity of the report is in question on October 20, 2017, I certainly would have expected Mr. Baram to communicate with his Confidential Source. This would have been an excellent opportunity for Mr. Baram to revisit his offer of confidentiality with his source, or to write an article on the information at hand, not including any mention of the Forged Police Report. In my opinion, it was irresponsible for Mr. Baram and Fast Company to publish the article on November 8, 2017, after receiving word that the information from his Confidential Source "does not appear to be authentic."

79.     Whether or not Mr. Baram's Source knew the report was fake when he published it, even after Mr. Baram and Fast Company definitively learned of its falsity, I would have expected them to take several remedial steps to ensure journalistic integrity, including a shift in focus to the fact that there is a forged report, which has been fed to several news reporters. These are the minimal actions I would have anticipated: (i) immediate replacement of the original article with a placeholder article that contains none of the

24

information derived from the Forged Police Report; (ii) requests for comment to Mr. Pishevar and the Source; (iii) verification of all items included in the original article that derived from the Forged Police Report; (iv) redaction of all items that could not be verified sans the Forged Police Report; (v) reframing of the article, depending on how much of it was structured according to aspects of the Forged Police Report; and (vi) adding a prominent editor's note explaining the correction in detail, noting that all unconfirmed details have been removed, and potentially adding comments from Mr. Pishevar, the Source, and other named authoritative stakeholders, if possible, about the Forged Police Report to the revised article. To the best of my knowledge, besides the Editor's Note referenced above, Fast Company and Mr. Baram did not take any of these steps.

80.     Knowing, as Mr. Baram does, that the media are approached often to plant propaganda, investigative journalists must use confidentiality as a last resort, interrogate the potential motives for information offered up by sources, and negotiate to minimize off-the-record information.

81.     My understanding is that Mr. Pishevar is not pursuing and does not intend to pursue private legal action against journalists nor news organizations, so Mr. Baram's concern for his liability is unwarranted. Given these considerations, I am not convinced and have not seen enough evidence to believe that, as a matter of journalism ethics, Mr. Baram, necessarily, is breaking his commitment if he facilitates the transfer of information that helps identify a bad actor who put the careers of all these journalists at risk. The ethical course of action in this situation would be to facilitate the provision of information that will identify the person who created the Forged Police Report. We have to refocus on the Fourth Estate's mandate: provide information in the public interest.

## V.   DISCLOSURE OF MR. BARAM'S SOURCE (AND INVESTIGATION OF THE FORGED POLICE REPORT) WOULD SERVE THE PUBLIC INTEREST

82.   I've learned in the past 30 years working at the intersection of information and technology that regulation lags behind the evolution of societal values and technology. Just as law must be revisited in rapidly changing contexts, so must our journalistic standards and practices.

83.   The current protocols—the ones that Mr. Baram seeks to enforce here and that the Amici Brief raise—are designed for a news industry operating with the technology of the 1960s and 70s. While those protocols have served our society well, they are increasingly less applicable. Now we must ensure our Codes of Ethics and standard practices are designed with our current and future technological contexts in mind. The confidentiality calculus has to change, because the potential harm is exponentially greater, for both the Plaintiff and the public at large, than it was in the 1960s and 70s.

84.   The increased reach of news organizations amplifies the potential damage to the subject of the Forged Police Report in this case. The increased speed of the news publication cycle amplifies the risk of error, inaccuracy, and a tendency to fail to verify. The nature of algorithmic sensationalism inappropriately amplifies extreme messaging, distorting news coverage and tipping the balance away from representative, verifiable truth and toward shocking, unverifiable, and high-ranking propaganda. This alone calls for a re-examination of the conditions under which confidential sources should be protected. Moreover, the Fourth Estate must protect the public from the actors who would exploit the sanctity of the journalist's commitment to protect the identity of a confidential source.[28]

---

[28]   I note that Mr. Pishevar is not pursuing a defamation claim, but, rather, aims to determine the source of a forged document being used to harm his personal and professional reputation. Thus, whether Mr. Baram's source acted with malice is of no concern to my analysis.

85.     Moreover, I am interested in the actions of Mr. Baram and his editor(s) that deviate from what I would consider to be common journalistic practice. The analysis of the versions of Mr. Baram's article compared to those of Fast Company's competitors indicates that more could have been done to present a fair and balanced contextualization of the news. The Amici Brief also argues that revealing a confidential source would have a chilling effect on future divulging of information in the public interest. This argument attempts to conflate all confidential source protection with the public interest of transparency. The argument is flawed, because it disregards the mounting public interest in rooting out sources of disinformation campaigns. Clearly, deception has occurred; there is great value in knowing which breed of disinformation campaign is afoot. Rooting out the bad actor who is manipulating the media and diminishing public trust in the profession of journalism is in the public interest.

86.     With full knowledge of the seriousness and importance of confidential source guarantees for investigative journalism and the appropriate balance between the public interest and source protection, I believe that the journalist's mandate is to report the truth. Confidential sources are protected from potential danger associated with being named in return for providing *truthful* information in the public interest.

87.     Our current news landscape begs the question, "How do we ensure that confidential sources are protected when appropriate, and manipulators are held accountable for the havoc they wreak?" Confidentiality protections should be employed only in the pursuit of providing truthful information to the public. Mr. Baram's protection of the source's identity does not provide truthful information to the public, yet it prevents Mr. Pishevar from taking any meaningful action to determine who forged the report. In addition, there has been no valid reason to indicate that the Confidential Source would be endangered were his identity revealed.

88.     Of course, Fast Company doesn't want to provide any opportunity to undermine the privilege. However, damage has already been done. Plus, the original article is still circulating through social media networks by virtue of the nature of algorithmic sensationalism.[29] To my knowledge, the source of the Forged Police Report has not been investigated, but it should be. If Mr. Baram is committed to never revealing a source, then he should be just as committed—if not more so, considering his journalistic mandate to serve the public interest—to tracking down the source of the forgery and reporting on the real news story here: Someone is forging City of London Police reports to smear a tech tycoon with impunity. Mr. Baram has an obligation not only to attempt to corroborate the information provided by his confidential source, but also to investigate the potential motives of a bad actor.

89.     In my professional judgment and experience, I believe that there are legitimate and ethical grounds for requiring Mr. Baram to disclose his confidential source. I consider this a narrow but necessary exception to the general rule in which confidential sources should remain protected by the reporters' privilege. The public interest in bringing those who create and disseminate forgeries to justice and the Fourth Estate's mandate to provide truthful information—combined with Mr. Baram's irresponsible choice to publish despite being told more than once by authorities that the Forged Report was inauthentic, the fact that the source did not provide truthful information, and the harm to Mr. Pishevar—outweigh the minimal burden of requiring Mr. Baram to identify a source.

---

[29] Ascher, 2017

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 6th day of January, 2020.

_____
Diana Ascher

ANNEX A

**Bibliography of References**

Abernathy, P. M. (2016). *The rise of a new media baron and the emerging threat of news deserts.* Chapel Hill: The Center for Innovation and Sustainability in Local Media, School of Media and Journalism, University of North Carolina at Chapel Hill. Retrieved from: http://newspaperownership.com/wp-content/uploads/2016/09/07.UNC_RiseOfNewMediaBaron_SinglePage_01Sep2016-REDUCED.pdf

Abiuso, C. M., (Summer 2019). You're Fake News: Preserving Both Free Speech and Defamation Lawsuits [notes]. *Hofstra Law Review, Vol. 47,* Issue 4, pp. 1359-1396.

Ascher, D. L. (2017). *The New Yellow Journalism: Examining the Algorithmic Turn in News Organizations' Social Media Information Practice through the Lens of Cultural Time Orientation.* UCLA. ProQuest ID: Ascher_ucla_0031D_16033. Merritt ID: ark:/13030/m5q868jd. Retrieved from https://escholarship.org/uc/item/5k712905

Baram, M. (October 8, 2019). How deepfakes evolved so rapidly in just a few years. *Fast Company.* Retrieved from: https://www.fastcompany.com/90414479/how-deepfakes-evolved-so-rapidly-in-just-a-few-years on December 23, 2019.

Bawden, D., & Robinson, L. (2009). The dark side of information: Overload, anxiety and other paradoxes and pathologies. *Journal of Information Science, 35*(2), 180-91.

Brown, F. (N. D.a). A Self-Serving Leak. *Society of Professional Journalists.* Retrieved from: https://www.spj.org/ecs12.asp on December 24, 2019.

Brown, F. (N. D.b). Deep Throat, and His Motive. *Society of Professional Journalists.* Retrieved from: https://www.spj.org/ecs18.asp on December 24, 2019.

Campbell, W. J. (2003). *Yellow Journalism: Puncturing the Myths, Defining the Legacies.* Praeger: Santa Barbara, CA. p. 72. Retrieved from: http://fs2.american.edu/wjc/www/yellowjo/intro.html on January 1, 2017.

Carney, D. (2012). Truth and the Unnamed Source, *Journal of Media Law, 4:*1, 117-145. DOI: 10.5235/175776312802483925

Farkas, J. (Fall/Winter 2018). Disguised Propaganda on Social Media: Addressing Democratic Dangers and Solutions. *Brown Journal of World Affairs 25 Brown J. World Aff.* Retrieved from: https://heinonline.org/HOL/Page?handle=hein.journals/brownjwa25&id=33&collection=journals&index= on December 24, 2019.

Fernandez, J. M. (2015). You Have My Word: Confronting Critical Questions Involving Journalists' Promises and Confidential Sources. *Asia Pacific Media Educator*, *25*(2), 305–318. https://doi.org/10.1177/1326365X15604947

Friedman, G. (2008). The deeper truth about Deep Throat: The FBI agent who leaked information about Watergate to the Washington Post and helped to destroy Richard Nixon was a master manipulator. *Mercatornet*. New Media Foundation. Retrieved from: https://www.mercatornet.com/articles/view/the_deeper_truth_about_deep_throat/ on December 24, 2019.

Gardner, H., Csikszentmihalyi, M., & Damon, W. (2002). Sources of strength in journalism. In *Good work: When excellence and ethics meet*, pp. 153-178. New York, NY: Basic Books.

Gottfried, J., & Shearer, E. (May 26, 2016). News use across social media platforms in 2016. Pew Research Center. Retrieved from: http://www.journalism.org/2016/05/26/news-use-across-social-media-platforms-2016/

Habermas, J. (2006). Political communication in media society: Does democracy still enjoy an epistemic dimension? The impact of normative theory on empirical research. *Communication Theory 16*, 411–426.

Kellner, D. (2004). The media and social problems. In *The Handbook of Social Problems: A Comparative International Perspective*, (George Ritzer, Ed.). SAGE Publications: Thousand Oaks, CA. http://dx.doi.org/10.4135/9781412973526

LaPorte, N. (August 2, 2018). Les Moonves and the conflicted moment of Hollywood's #MeToo movement. Fast Company. Retrieved from: https://www.fastcompany.com/90213155/les-moonves-and-the-conflicted-moment-of-hollywoods-metoo-movement on December 31, 2019.

Pew Research Center. (2016). *State of the news media*. Retrieved from: http://assets.pewresearch.org/wp-content/uploads/sites/13/2016/06/State-of-the-News-Media-Report-2016-FINAL.pdf

Rosen, J. (2008). *A most useful definition of citizen journalism*. Retrieved from: http://journalism.nyu.edu/pubzone/weblogs/pressthink/2008/07/14/a_most_useful_d.html on January 1, 2017.

SPJ Code of Ethics. (N. D.). *Society of Professional Journalists*. Retrieved from: https://www.spj.org/pdf/spj-code-of-ethics.pdf on December 24, 2019.

Stankiewicz, K. (September 20, 2019). 'Perfectly real' deepfakes will arrive in 6 months to a year, technology pioneer Hao Li says. CNBC. Retrieved from: https://www.cnbc.com/2019/09/20/hao-li-perfectly-real-deepfakes-will-arrive-in-6-months-to-a-year.html on December 23, 2019.

Tigar, L. (October 23, 2018). 9 women executives on how MeToo has changed the way they mentor. Fast Company. Retrieved from: https://www.fastcompany.com/90252403/9-women-executives-on-how-metoo-has-changed-the-way-they-mentor on December 31, 2019.

Wexler, L., Robbennolt, J. K., & Murphy, C. (2019). #MeToo, Time's Up, and theories of justice. *U. Ill. L. Rev. 45*, 45-110.

Whyte, K. (2009). *The uncrowned king: The sensational rise of William Randolph Hearst.* Vintage Canada.

Yellow journalism. (2013, July 30). *New World Encyclopedia.* Retrieved from: http://www.newworldencyclopedia.org/p/index.php?title=Yellow_journalism&oldid=971709 on January 1, 2017.