USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/18/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF SHERVIN PISHEVAR FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

1:19-MC-00503 (JGK) (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, United States Magistrate Judge:**

Before the Court is an application by Petitioner Shervin Pishevar ("Petitioner" or "Pishevar") for an Order to obtain discovery from Marcus Baram ("Respondent" or "Baram") for use in foreign proceedings, pursuant to 28 U.S.C § 1782.[1] (Baram 1782 Application, ECF No. 1). As set forth below, the Baram 1782 Application is DENIED.

## BACKGROUND

### I. Pishevar And His Arrest

Pishevar is co-founder of Sherpa Capital, a venture capital firm. (Pet. Mem., ECF No. 4, at 2.) On May 27, 2017, he was arrested in a London hotel by the City of London Police (the "COLP") on suspicion of sexual assault. (*Id*. at 4.) After he received inquiries relating to his arrest by a journalist for a United Kingdom-based newspaper, *The Sun*, on June 21, 2017, Pishevar obtained an injunction in England preventing *The Sun* from naming or identifying Pishevar in relation to the arrest in any future publications (the "Injunction"). (*See id*. at 5; Resp. Mem., ECF No. 14, at

[1] As set forth in Background Section V, *infra*, this Court previously granted Petitioner leave to obtain discovery from Fast Company (where Baram works) and Mansueto Ventures LLC ("Mansueto") (which owns Fast Company). *See In re Application of Shervin Pishevar for an Order to Take Discovery for use in Foreign Proceedings Pursuant to 28 U.S.C. 1782*, No. 19-MC-00370, ECF No. 8 (S.D.N.Y. Aug. 9, 2019) (the "Initial 1782 Application"). This Application was filed to obtain information from Baram that Fast Company and Mansueto asserted was protected by the reporter's privilege.

4.) On August 1, 2017, the COLP issued a press statement, which did not mention Pishevar by name, but which stated: “Following an investigation into a report of a rape at a location on Poultry, EC2 [London] on Saturday 27 May 2017, we can confirm that no further action will be taken. A 43-year-old man from San Francisco was initially arrested on suspicion of rape before being released under investigation.” (Watson Decl., ECF No. 7, ¶ 14 & Ex. 2, ECF No. 7-2.)

## II. Baram, The Confidential Source And Baram’s Fast Company Article

Baram is a Senior News Editor at Fast Company in New York.[2] (Pet. Mem. at 3; Resp. Mem. at 4.) On or about July 27, 2017, he received a tip from someone he refers to as a “Confidential Source”[3] that Pishevar had been arrested. (Baram Aff., ECF No. 15, ¶ 6.) All the information that Baram received from the Confidential Source was offered on the condition that Baram would not disclose the Confidential Source’s identity. (*Id*. ¶ 5.)

In September 2017, Baram received from the Confidential Source a thumb drive that contained a copy of a police report purporting to be from the COLP (the “Subject Police Report”).[4] (Baram Aff. ¶ 8; *see also* Pet. Mem. at 5-6.) On October 13, 2017, Baram contacted the COLP press team to inquire about the arrest. (Watson Decl. ¶ 15.) The COLP responded to say that the investigation into the arrest no longer was ongoing and, as such, no further action would be

[2] Fast Company is a magazine founded in 1995 that has been owned by Mansueto since 2005. (*See* Pet. Mem. at 3-4; Resp. Mem. at 4.)

[3] This same individual is referred to by Petitioner as “Forged Report Distributor 1.” (*See* Resp. Mem. at 1.) In this Opinion and Order, this individual will be referred to as the “Confidential Source.”

[4] A copy of the Subject Police Report was provided to the Court for its *in camera* review and has been filed by the Court under seal on the docket at ECF No. 46. In addition, the Court ordered (2/10/20 Order, ECF No. 44), and Petitioner provided to the Court for its *in camera* review (with a copy to Respondent’s counsel pursuant to an Attorneys’ Eyes’ Only restriction), documentation received by Petitioner and/or his English criminal counsel, at or around the time of his arrest, setting forth the details of his arrest. The letter and exhibits provided to the Court regarding this documentation has been filed under seal by the Court on the docket at ECF No. 51.

taken. (*Id*.) On October 15, 2017, Baram contacted the COLP again to ask whether they would confirm that it was Pishevar who was arrested. (*Id*.) The following day the COLP responded to say that, as per COLP policy, they could neither confirm nor deny any name put to them in connection with an arrest. (*Id*.) At the same time, the COLP confirmed that the investigation was not being reviewed and would not be reopened. (*Id*.)

On October 18, 2017, Baram emailed the COLP a copy of the Subject Police Report that he had obtained from the Confidential Source. (Watson Decl. ¶ 16.) Baram requested that the COLP confirm whether the Subject Police Report was authentic. (*Id*.; Baram Aff. ¶ 9.) On October 20, 2017, the COLP emailed Baram stating that it did not use "documents such as [the Subject Police Report] and [did] not believe it to be authentic." (Watson Decl. Ex. 3, ECF No. 7-3.) Baram states that the language used by the COLP, "to a seasoned reporter, is not a definitive statement of falsity." (Baram Aff. ¶ 9.) Baram also received an electronic communication from the COLP on October 23, 2017 stating that there is no officer in the COLP named "DC Brook," and that the reference to that name in the Subject Police Report "leads [the COLP] to believe [the report] is false." (Watson Decl. Ex. 4, ECF No. 7-4; *see also* Watson Decl. ¶ 17.) Nevertheless, Baram asserts that he "did not receive a definitive statement that the police report was a fabrication until November 13, 2017." (Baram Aff. ¶ 9.)

On Wednesday, November 8, 2017, Fast Company published an article authored by Baram entitled "'Smear Campaign' Or Not, Tech Investor Shervin Pishevar Really Was Arrested Earlier This Year." (Baram Aff. Ex. 4, ECF No. 15-4.) The article states, in part: "Pishevar was indeed arrested last May on suspicion of rape at the Ned hotel in London, according to his crisis management expert and a copy of a police report seen by Fast Company, though he was never

charged with any crime." (*Id*.) The article also states that the "authenticity [of the Subject Police Report] has not been verified." (*Id*.) The article quotes from a statement issued by Pishevar, which states, in part:

> In May 2017, Mr. Pishevar was detained briefly in London in connection with a[n] alleged sexual assault, an allegation he categorically denied. He fully cooperated with the police investigation which was exhaustive and detailed. In July he was informed that no further action would be taken against him and he was "dearrested" (a British legal term).

(*Id*.) Pishevar had issued this statement earlier the same day, "[a]fter being contacted by various media organizations requesting comment on the [Subject Police Report]."[5] (Watson Decl. ¶ 20.) The November 8, 2017 Fast Company article later was updated to state that, on Monday, November 13, 2017, "we learned that a police report described in this story has been proven false by the City of London police." (Baram Aff. Ex. 4.; *see also* Baram Aff. ¶ 14.)

## III. Other Publications Regarding Pishevar's Arrest

After November 8, 2017, numerous other media outlets published stories about Pishevar's arrest, including *Forbes* and the *New York Post*. (Baram Aff. ¶ 13; Watson Decl. ¶ 22.) The *Forbes* article, which was published on November 9, 2017, referred to "a police report obtained by Forbes." (Baram Aff. Ex. 5, ECF No. 15-5.) The *Forbes* article later was updated to state that "[o]n November 14, 2017, the City of London Police told Forbes that the report is a forgery . . .." (*Id*.)

The *New York Post* article, which also was published on November 9, 2017, referred to "a police report obtained by the Post." (Baram Aff. Ex. 6, ECF No. 15-6.) The *New York Post* article

[5] On November 10, 2017, following the Petitioner's statement on November 8, the Injunction was lifted. (Watson Decl. ¶ 24.)

also was later updated to state that "[o]n November 14, 2017, the City of London Police announced that the police report described in this story was not a genuine police report from its department and that it 'contains inaccurate factual information' . . .." (*Id.*)

## IV. <u>Information Provided By The COLP Regarding The Pishevar Arrest And The Subject Police Report</u>

On November 9, 2017, Hickman & Rose, Pishevar's UK criminal counsel, contacted the COLP to inquire whether any private information relating to Pishevar had been disclosed to the media following Pishevar's arrest. (Watson Decl. ¶ 23.) On November 10, 2017, the COLP confirmed that no such disclosure had been made and Hickman & Rose responded with a request for a copy of the Subject Police Report. (*Id.*) On November 13, 2017, the COLP declined the request due to ongoing inquiries as to the purported commission of any criminal offences related to the Subject Police Report. (*Id.*)

In an email to the COLP, dated September 28, 2018, Hickman & Rose renewed their request for a copy of the Subject Police Report and also requested confirmation as to the source that provided it to the COLP. (Watson Decl. ¶ 25.) In a response, dated October 25, 2018, the COLP's in-house lawyer stated that they "can confirm that there is no criminal investigation in respect of the document in question. The City of London Police is content for me to inform you that the screenshot of the document was supplied to them by Marcus Baram of Fast Company. The City of London Police is not prepared to provide a copy of the screenshot without a court order requiring disclosure." (*Id.*; Watson Decl. Ex. 6, ECF No. 7-6.) Also, in October 2018, the COLP informed Baram "that the COLP's internal investigation had concluded the COLP was not the source of any leak, and that there was no criminal investigation of the matter." (Baram Aff. ¶ 19.)

On November 1, 2018, Hickman & Rose made an information request to the COLP for the Subject Police Report. (Watson Decl. ¶ 26; Macdonald Decl., ECF No. 6, ¶ 17.) Thereafter, on April 4, 2019, Hickman & Rose made a disclosure application to the English High Court seeking to compel the COLP to disclose a copy of the Subject Police Report and to explain its provenance. (Macdonald Decl. ¶ 18.) On May 29, 2019, the English High Court ordered the COLP to comply with the request. (*Id*.) On the same day, the COLP complied and provided a copy of the Subject Police Report to Hickman & Rose. (*Id*. ¶ 19.) The COLP further confirmed via a signed witness statement from Teresa La Thangue (COLP's Communications Director) that the Subject Police Report was fake. (*Id*.; Macdonald Decl. Ex. 5, ECF No. 6-5.)

On June 11, 2019, the COLP provided additional documents to Pishever, detailing the COLP's internal investigation into the Subject Police Report's authenticity, as well as contact with media outlets following inquiries into Pishevar's arrest. (Watson Decl. ¶¶ 27-28.) Among the documents provided to Pishevar was an October 24, 2017 COLP report which stated that "it was 'unlikely' that the [Subject Police Report] had been created within COLP or leaked by COLP to the media." (*Id*. ¶¶ 18, 28.)

## V. <u>Documents Produced Pursuant To Initial 1782 Application</u>

The Initial 1782 Application was filed on August 6, 2019 (Initial 1782 Application, ECF No. 1), and was granted by me on August 9, 2019, authorizing the service of subpoenas upon Fast Company and Mansueto. (Initial 1782 Application, 8/9/19 Order, ECF No. 8.) In response to the subpoenas, between September 17, 2019 and October 21, 2019, Fast Company and Mansueto produced certain information about the Subject Police Report. (*See* Watson Decl. ¶ 30; Macdonald Decl. ¶ 21.) However, Fast Company and Mansueto refused on the basis of the

reporter's privilege to disclose to Pishevar the identity of the Confidential Source who provided the Subject Police Report to Baram. (*See* Pet. Mem. at 2 n.2; *see also* Bento Decl. Ex. 7, ECF No. 5-7; Bento Decl. Ex. 9, ECF No. 5-9.)

As part of a meet and confer process regarding the Initial 1782 Application, Mansueto provided certain information from Baram in response to questions posed by Pishevar. For example, Mansueto stated to Pishevar's counsel that the Confidential Source provided to Baram information that Pishevar allegedly had paid a British female sexual assault victim a sum of money and that she had "dropped the charges." (*See* Bento Decl. Ex. 11, ECF No. 5-11.)

## VI. Definers Public Affairs And Its Involvement In Providing Disparaging Information About Pishevar To The Media

On November 6, 2017, Pishevar filed a lawsuit in California Superior Court against Definers Corp. and Definers Public Affairs (collectively, "Definers"), as well as Matthew Rhoades and Joseph Pounder, two individuals affiliated with Definers,[6] alleging that they had been "retained by competitors or other business adversaries of Mr. Pishevar to orchestrate and implement a malicious smear campaign, apparently designed to incite false, defamatory, and highly damaging chatter and gossip about Mr. Pishevar amongst reporters" and others. (*See* Definers Compl. ¶¶ 2, 5-9.)[7] Pishevar alleged in the Definers Lawsuit that among the false rumors

---

[6] Definers, Rhoades and Pounder collectively are referred to herein as the "Definers Defendants."

[7] This Complaint was filed in the action entitled *Pishevar v. Rhoades*, Case No. GGC-17-562305 (Superior Court, County of San Francisco). Although Respondent made mention of the California Superior Court lawsuit in his opposition papers (*see* Resp. Mem. at 4-7; Baram Aff. ¶ 10; Peacocke Decl. ¶ 92), he did not file a copy of the Complaint with the Court. A copy of the Complaint was provided to the Court during oral argument. (2/10/20 Tr., ECF No. 47, at 59-60.) Since the Complaint is a public record, the Court may take judicial notice of it. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of complaint filed in another lawsuit "as a public record"). The California Superior Court lawsuit against the Definers Defendants is referred to herein as the "Definers Lawsuit."

fed to reporters by the Definers Defendants was "a false claim that Mr. Pishevar entered into a settlement agreement" concerning sexual misconduct. (*Id*. ¶ 29.) Pishevar also alleged that "Defendants falsely stated to a third party that Mr. Pishevar had paid money to settle a claim for sexual assault in London." (*Id*. ¶ 30(e).) Further, Pishevar alleged that there are various other persons and/or entities that "participated, contributed, conspired, aided and abetted, or ratified the conduct of Defendants." (Id. ¶ 10.)

The California Superior Court docket reflects that the Definers Defendants in December 2017 filed a motion to strike the complaint.[8] In support of the motion to strike, the Definers Defendants filed with the Superior Court six declarations, each dated December 6, 2017, in which senior executives at Definers, including its Chief Executive Officer, stated that they "do not have and have never seen a police report or a purported police report involving Mr. Pishevar." (Pet. 2/14/20 Ltr. Ex. 2, ECF No. 50-2.)

In a declaration filed on December 29, 2017 in opposition to the Definers Defendants' motion to strike, Pishevar filed a declaration stating that, "in early November 2017 [he] learned that Matthew Rhoades and Definers were circulating" false statements about him, including "[a]n accusation that [Pishevar] paid money to settle a claim for sexual assault in London." (Pishevar Decl., Case No. CGC-17-562305, S.F. County Super. Ct. ("Pishevar Cal. Super. Ct. Decl."), ¶ 3.) On February 2, 2018 the Definers Lawsuit was dismissed by Pishevar. On February 2, 2018, Pishevar issued a statement regarding the dismissal, as follows:

> Today I filed a request to dismiss the Definers lawsuit. No damages were paid. I now intend to continue to focus my full attention on those who should ultimately

[8] The San Francisco Superior Court docket (along with links to the filed documents) is available at: https://webapps.sftc.org/ci/CaseInfo.dll?CaseNum=CGC17562305&SessionID=4B81E678C0DF6CDF8C88D3680AD6F4959416EABC.

> be held responsible for the smear campaign that has been waged against me, including the falsification and distribution of the fraudulent London police report. The fraudulent police report is being investigated by law enforcement so we are hopeful the culprits will be found and justice will be served.

(Baram Aff. Ex. 10, ECF No. 15-10.)

## VII. Contemplated English Civil Proceedings

Pishevar asserts that he contemplates initiating civil proceedings in England against the Confidential Source and the individual who provided the Subject Police Report to the Confidential Source, as well as the creator(s) of the Subject Police Report, for negligent misstatement, libel and/or slander on the theory that the they owed Pishevar a duty of care not to publish private information about him which they knew to be false, yet did so regardless, which information the media have relied on, thereby causing Pishevar to suffer loss, including serious harm to his reputation. (*See* Watson Decl. ¶¶ 32-44.) Pishevar has retained English counsel to pursue these claims. (*Id*. ¶ 33.)

## VIII. Contemplated English Criminal Proceedings

Hickman & Rose, as counsel to Pishevar, is planning to initiate a criminal action in England against the Confidential Source and the individual who provided the Subject Police Report to the Confidential Source, as well as the creator(s) of the Subject Police Report. (*See* Macdonald Decl. ¶ 23.) Pishevar's Queen's Counsel avers that these individuals acted in violation of Sections 1-4 of the Forgery and Counterfeiting Act 1981, Section 2 of the Fraud Act 2006, Sections 6-7 of the Fraud Act 2006 and Section 1 of the Malicious Communications Act 1988. (*Id*. ¶¶ 26-32.) Criminal

charges under these statutes may be brought by an English prosecutor or by way of private prosecution.[9] (*Id*. ¶¶ 33-37.)

**IX. <u>Information Sought In Baram 1782 Application</u>**

Pishevar brings the Baram 1782 Application to obtain from Respondent information "sufficient to identify" the Confidential Source. (Pet. Mem. at 13.) The draft subpoenas included with the 1782 Application seek "[a]ll Documents and Communications in [Baram's] possession, custody, or control relating to the [Subject] Police Report, including any information sufficient to identify the identity and location of the [Confidential Source] and any other distributor of the [Subject] Police Report," as well as testimony from Baram. (Draft Subpoenas, ECF No. 5-2.) However, Pishevar's counsel stated at oral argument that he now only seeks information regarding the identity and location of the Confidential Source. (2/10/20 Tr. at 81.)

**<u>LEGAL STANDARDS</u>**

Pursuant to 28 U.S.C. § 1782, "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . .." 28 U.S.C. § 1782(a). Such an order may be made "upon the application of any interested person." *Id*. "To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure." *Id*.

[9] Pishevar's Queen's counsel asserts that Baram is not intended to be the subject of any of the contemplated proceedings in England, as "there has never been any suggestion, nor could there be, that Mr[.] Baram has committed a criminal offence in relation to the [Subject Police Report.]" (Macdonald Reply Decl., ECF No. 19, ¶ 18.)

Nevertheless, "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." *Id*.

In ruling on a Section 1782 application, a district court first must determine whether three statutory requirements are met: (1) the person from whom discovery is sought must "reside" or be "found" in the district, (2) the discovery must be "for use in a proceeding before a foreign tribunal," and (3) the application must be "made by a foreign or international tribunal or any interested person." *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 243 (2d Cir. 2018), *cert. denied sub nom. Kiobel ex rel. Samkalden v. Cravath, Swaine & Moore LLP*, ––– U.S. ––––, 139 S. Ct. 852 (2019).

After determining that the statutory requirements are met, the court then must exercise its discretion, considering four factors identified by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc*., 542 U.S. 241 (2004): (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which event "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad;" (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the request is "unduly intrusive or burdensome." *Id*. at 264-65.

"The *Intel* factors are not to be applied mechanically," *Kiobel*, 895 F.3d at 245, as they are simply "guides for the exercise of district-court discretion." *Intel*, 542 U.S. at 263 n.15. These factors are "non-exclusive," *Kiobel,* 895 F.3d at 244, and the district court "should also take into

account any other pertinent issues arising from the facts of the particular dispute." *Id*. at 245. "[D]istrict courts must exercise their discretion under § 1782 in light of the twin aims of the statute: 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts . . ..'" *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997).

Any discovery permitted under 28 U.S.C. § 1782 is subject to the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 1782(a) (". . . the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure"). Rule 45 of the Federal Rules of Civil Procedure governs depositions of non-parties by subpoena. *See* Fed. R. Civ. P. 45. Rule 45 provides that a subpoena may be quashed or modified if it requires disclosure of "privileged or other protected matter." *See* Fed. R. Civ. P. 45(d)(3)(A)(iii). Further, Section 1782 expressly provides that "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a).

Because the jurisdictional basis for a Section 1782 application rests on a federal statute, federal common law governs any assertions of privilege. *See In re Federation Internationale de Basketball*, 117 F. Supp. 2d 403, 407 (S.D.N.Y. 2000). Furthermore, courts have concluded that the statute's protection extends to privileges recognized by foreign law, but consonant with courts' reticence to delve into complex questions of foreign law, parties are generally required to provide clear and authoritative proof that a foreign tribunal would reject evidence pursuant to a foreign privilege. *See Metallgesellschaft*, 121 F.3d at 80.

Since the Court's decision on a Section 1782 application is non-dispositive, it may be decided by a magistrate judge by opinion and order, rather than a report and recommendation to the district court. *See In re Hulley Enterprises Ltd*., 400 F. Supp. 3d 62, 71 (S.D.N.Y. 2019) ("This Court agrees with the majority of courts finding that rulings on § 1782 applications are *not* dispositive." (emphasis in original) (citations omitted)).

**DISCUSSION**

**I. Mandatory Criteria Of Section 1782**

The Court first addresses the mandatory criteria of Section 1782 before turning to the discretionary criteria.

**A. Person From Whom Discovery Is Sought Is Located In This District**

Baram is a resident of New York (Baram Aff. ¶ 1) and therefore is located in this district.

**B. Petitioner Seeks Discovery "For Use" In Foreign Proceedings**

Under Section 1782, "the foreign proceeding need not be pending, so long as it is 'within reasonable contemplation.'" *Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015) (quoting *Intel*, 542 U.S. at 259). "[A] § 1782 applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P*., 798 F.3d 113, 124 (2d Cir. 2015). The applicant "must provide some objective indicium that the action is being contemplated . . . [and] the proceedings cannot be merely speculative." *Id*. at 123-24.

In the present case, Petitioner contends that he will use the identity of the Confidential Source to plead and prove his civil and criminal claims in the United Kingdom. (See Macdonald Decl. ¶¶ 23-37; Watson Decl. ¶¶ 32-44.) Respondent contends that the discovery is not "for use"

in connection with proceedings in the United Kingdom because the civil claims for libel and/or slander are time-barred; the civil claim for negligent misstatement is not viable; and no criminal proceeding is reasonably contemplated. (Resp. Mem. at 19-24.)

Petitioner has retained counsel to pursue civil claims in the United Kingdom and counsel has articulated the civil claims that will be brought. (*See* Watson Decl. ¶¶ 32-44.) Petitioner argues that the libel and/or slander claims are not time-barred under English law, based upon Section 32A of the Limitation Act of 1980, since Petitioner did not learn of certain publications until September 2019. (*See* Watson Reply Decl., ECF No. 20, ¶¶ 16-17.) Petitioner also argues that his negligent misstatement claim is viable based upon precedent from the Supreme Court of Ireland. (*See id.* ¶¶ 10-13.)

The Court finds that Petitioner has established the required concrete basis for the contemplated civil proceedings. Respondent's arguments that the libel and/or slander claims are time-barred, and that the negligent misstatement claim is not a viable claim since Petitioner cannot plead the required elements of such a claim (*i.e.*, duty, reliance and economic loss) (*see* Peacocke Decl., ECF No. 16, ¶ 74), are unavailing. A Section 1782 applicant need only "establish that he or she has the practical ability to inject the requested information into a foreign proceeding," and "as long as he or she makes that showing, it is not fatal to the application that he or she lacks a claim for relief before the foreign tribunal, whether for damages or otherwise." *In re Accent Delight Int'l Ltd*., 869 F.3d 121, 132 (2d Cir. 2017). Thus, it is not incumbent on this Court to determine whether or not Petitioner has a timely claim for relief on his libel and/or slander claims. Nor is it incumbent on the Court to determine whether or not Petitioner's claim

for negligent misstatement is viable or not.[10] *See Mees*, 793 F.3d at 298-99 ("We have previously rejected similarly 'speculative forays into legal territories unfamiliar to federal judges' . . .." (quoting *Euromepa S.A. v. R. Esmerian, Inc*., 51 F.3d 1095, 1099-100 (2d Cir. 1995))). It is enough that the information sought in the Section 1782 application will be used in the foreign tribunal in connection with the contemplated civil proceedings.

Petitioner also has met the "for use" standard with respect to the contemplated criminal proceedings. Petitioner's counsel has "sworn that [Petitioner] intend[s] to file a criminal complaint against [the Confidential Source] in the [United Kingdom] and [has] articulated [ ] specific legal theor[ies] on which [he] intends to rely." *In re Furstenberg Fin. SAS*, No. 18-MC-00044 (JGK), 2018 WL 3392882, at *4 (S.D.N.Y. July 12, 2018), *reconsideration denied*, 334 F. Supp. 3d 616 (S.D.N.Y. 2018), *aff'd*, 785 F. App'x 882 (2d Cir. 2019). As in *Furstenberg*, the sworn declaration of counsel (*see* Macdonald Decl. ¶ 23) is a "sufficient" indicium that "the [criminal] action is within reasonable contemplation." *See In re Furstenberg Fin. SAS*, 2018 WL 3392882, at *4.

In sum, the Court finds that Petitioner has made the required *de minimis* showing that the information sought is "for use" in the reasonably contemplated civil and criminal foreign proceedings. *See In re Children's Inv. Fund Found. (UK)*, 363 F. Supp. 3d 361, 371 (S.D.N.Y. 2019) ("For purposes of the statutory requirement, [a]pplicants need only make a de minimis showing

---

[10] It also is not incumbent on the Court to determine whether or not the information obtained by Petitioner will be admissible in the foreign proceedings. *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("[A] district court . . . should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application." (emphasis in original)).

that the requested discovery is 'for use' in the proceeding, so long as the proceeding falls within the scope of § 1782.").

### C. Petitioner Is An Interested Person

Petitioner will be the plaintiff in the contemplated civil lawsuit and, as such, is an "interested person." *Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."). Petitioner also is an "interested person" with regard to the contemplated criminal proceedings. *See In re Children's Inv. Fund Found. (UK)*, 363 F. Supp. 3d at 372 ("a complainant in a criminal investigation satisfies the 'interested person' requirement of § 1782").

## II. ***Intel*'s Discretionary Factors**

As discussed below, the Court finds that, although the first two *Intel* factors weigh in Petitioner's favor, the third and fourth do not.

### A. Whether Respondent Is Party To Foreign Proceedings

The first *Intel* factor looks to whether the person from whom discovery is sought is a participant in the foreign proceeding. *Intel*, 542 U.S. at 264. If the respondent is a participant, "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Id*. Petitioner has represented to the Court that the Respondent will not be a party to the contemplated proceedings in England. (*See* Pet. Mem. at 23.) Thus, this factor weighs in Petitioner's favor.

### B. Receptivity Of Foreign Government To U.S. Federal Court Judicial Assistance

The second *Intel* factor weighs "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or

agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. "Absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa, S.A.*, 51 F.3d at 1102. A court should deny discovery on the basis of lack of receptiveness only where it is provided with "authoritative proof that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id*. at 1100.

Petitioner has made a showing that the English courts would be receptive to evidence obtained through the Baram 1782 application. (*See* Macdonald Decl. ¶¶ 40-46; Watson Decl. ¶¶ 50-53.) Respondent's opposition memorandum does not argue that the second *Intel* factor weighs against the 1782 application (but only argues the third and fourth factors). (*See* Resp. Mem. at 24-25.) In any event, Respondent has failed to provide the Court with authoritative proof that the English courts would reject the evidence obtained by the Baram 1782 Application, *i.e*., the identity of the Confidential Source. Respondent did submit a declaration from a dual-qualified English barrister and New York licensed attorney arguing that an English court would uphold Baram's "privilege against disclosure" of his Confidential Source. (Peacocke Decl. ¶¶ 12-25, 72; *but see* footnote 11, *infra*.) However, even that declaration notes that disclosure of a journalist's source of information in an English court proceeding may be compelled if it is established to the satisfaction of the court that disclosure is necessary in the interests of justice. (*Id*. ¶¶ 21, 37, 40.) Moreover, Petitioner has provided from his Queen's Counsel their opinions that English courts would not protect the identity of the Confidential Source. (*See* Tomlinson Decl., ECF No. 21; Grieve Decl., ECF No. 29.)

## C. Whether Application Circumvents Foreign Proof-Gathering Restrictions Or U.K. Or U.S. Policies

The third *Intel* factor considers "'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.'" *Intel*, 542 U.S. at 265. *Mees* has noted that this factor does "not 'authorize denial of discovery pursuant to § 1782 solely because such discovery is unavailable in the foreign court, but simply . . . allow[s] consideration of foreign discoverability (along with many other factors) when it might otherwise be relevant to the § 1782 application.'" 793 F.3d at 303 (quoting *In re Metallgesellschaft*, 121 F.3d at 79). "Courts may grant § 1782 applications even where the applicant did not first seek discovery in the foreign tribunal . . ., or where the information sought was not discoverable under the laws of the foreign country at issue in the foreign proceeding." *In re BNP Paribas Jersey Tr. Corp. Ltd. for an Order Pursuant to 28 U.S.C. §1782 to Conduct Discovery for Use in Foreign Proceedings*, No. 18-MC-00047 (PAC), 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018) (citations omitted).

Respondent makes two arguments regarding the third *Intel* factor. First, he argues that Petitioner is attempting to circumvent foreign proof-gathering restrictions because Petitioner is seeking to compel information that "would be shielded from disclosure in the United Kingdom based on Baram's reporter's privilege and privilege against compelled self-incrimination." (Resp. Mem. at 25.) This is the same argument rejected by the Second Circuit in *Metallgesellschaft* in circumstances where, as here, no authoritative proof was submitted regarding the foreign law privileges asserted by Respondent.[11] *See Metallgesellschaft*, 121 F.3d at 80 ("[W]hether . . . a

[11] The lack of authoritative proof regarding the reporter's privilege under English law is discussed above. There is a similar lack of authoritative proof regarding application of the privilege against compelled self-

privilege exists under German law is far from clear. To require the district court to determine such an issue would involve it in a speculative foray into legal territories unfamiliar to federal judges. Such a foray would result in an unduly expensive and time-consuming fight about foreign law, undermining the twin aims of the statute." (internal quotation marks, citations & alterations omitted)).

Second, Respondent argues that Petitioner is seeking to "sidestep discovery mechanisms" in the United Kingdom that "are available" to Petitioner. (Resp. Mem. at 25.) However, as noted above, courts may grant Section 1782 applications even where the applicant did not first seek discovery in the foreign tribunal. *See BNP Paribas*, 2018 WL 895675, at *3. Moreover, Respondent fails to explain how Petitioner can obtain discovery in a United Kingdom-based legal proceeding from Baram, who is located in New York.

Notwithstanding the foregoing, the third *Intel* factor weighs against granting the Baram 1782 Application based upon the U.S. public policy that undergirds the reporter's privilege. The reporter's privilege is "grounded . . . in a broader concern for the potential harm to the 'paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters.'" *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 33 (2d Cir. 1999) (citation omitted). Because the Court finds that

---

incrimination to the facts in this case. Respondent's counsel asserts that such a privilege applies here because of Respondent's involvement with the Subject Police Report. (Peacocke Decl. ¶¶ 12-25; Resp. 2/14/20 Ltr., ECF No. 49.) However, Petitioner's Queen's Counsel asserts that "it has never been suggested by anyone else that Mr[.] Baram has, or may have, committed any category of criminal act," and thus that Baram is not "at any risk of self-incrimination." (Macdonald Reply Decl. ¶ 18; *see also* Pet. 2/20/20 Ltr., ECF No. 50.)

the reporter's privilege has not been overcome (*see* Discussion Section III, *infra*), the third *Intel* factor weighs against granting the Baram 1782 Application.

**D. Whether Baram 1782 Application Is Unduly Intrusive Or Burdensome**

The fourth *Intel* factor considers whether the applicant's request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. Petitioner already has obtained much of the information sought in his subpoena from Fast Company and Mansueto. During oral argument, Petitioner agreed to limit Respondent's response to the pending Application to the name and location of the Confidential Source. (*See* 2/10/2020 Tr. at 81.) Such a limited response is not unduly burdensome.

Respondent, however, argues that the Baram 1782 Application is unduly intrusive because Baram is protected from disclosure by the reporter's privilege. (*See* Resp. Mem. at 25.) The issue of the reporter's privilege is discussed in the following section, and leads the Court to deny the Baram 1782 Application.

**III. Reporter's Privilege Under U.S. Law**

As set forth above, if a privilege protects the information that is sought in a Section 1782 application, then such application may be denied. *See* Lucas V.M. Bento, *The Globalization of Discovery* 16, 242, 246 (Wolters Kluwer 2020) (information may be withheld when responding to Section 1782 application if privilege, such as reporter's or journalist privilege, applies). Thus, the Court considers the reporter's privilege under federal law, which as noted above, controls here.

A reporter has "a qualified evidentiary privilege for information gathered in a journalistic investigation." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 308 (2d Cir. 2011). "The privilege is designed to support the press in its valuable public service of seeking out and revealing truthful

information." *Id*. As stated by the *amici curiae*,[12] a journalist's ability to foster and maintain confidential relationships with sources is essential to effective reporting. (Amici Br., ECF No. 23-1, at 3 (citing *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981).) "The law in [the Second] Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *In re Petroleum Prod. Antitrust Litig*., 680 F.2d 5, 7 (2d Cir. 1982) (citations omitted).

Respondent argued in his written submissions to the Court that the information that is the subject of the Baram 1782 Application is available from other sources; namely, other media outlets that had access to the Subject Police Report (Resp. Mem. at 14) and the COLP. (*Id*. at 14-15.) At oral argument, Respondent also argued that Petitioner's allegations in the Definers Lawsuit that Rhoades, Pounder and/or Definers "communicated [a] false report to one or more reporters" about an alleged sexual assault showed that Petitioner could, and should, seek to obtain the information from Definers.[13] (*See* 2/10/20 Tr. at 50.) Petitioner countered in his written submissions that the information is unavailable elsewhere, as the other media outlets would raise the same reporter's privilege challenges as Respondent (*see* Reply Mem., ECF No. 18, at 8), and the COLP had no additional information to provide. (*Id*. at 8-9.)

---

[12] *Amici curiae* are the Reporters Committee for Freedom of the Press and the Media Legal Defence Initiative.

[13] Respondent's counsel argued: "So I am not clear why Mr. Pishevar dropped that lawsuit; but even given that he did, I don't understand why he would come to my client saying that we need to make a reporter divulge their confidential source of truthful reporting rather than going after Definers under 1782." (2/10/20 Tr. at 50.)

Petitioner did not respond at oral argument to Respondent's contention that he could obtain the information from the Definers Defendants. However, in a February 14, 2020 letter to the Court, Petitioner submitted six December 6, 2017 declarations that the Definers Defendants filed in the California Superior Court denying any involvement with the alleged smear campaign against Petitioner and denying any involvement with the Subject Police Report. (*See* Pet. 2/14/20 Letter Ex. 2.) Petitioner thus argued that "Definers is not an alternative source." (Pet. 2/14/20 Ltr. at 2.)

The Court finds that that the identity of the Confidential Source is highly material and relevant and is critical to maintenance of the contemplated civil and criminal proceedings. The civil proceedings cannot be maintained without knowing the identity of the putative defendants and the criminal proceedings cannot be commenced without knowing the identity of the putative defendants. However, the Court also finds that Petitioner has failed to make a clear and specific showing that the identity of the Confidential Source is not obtainable from other available sources. Although the Court finds that the information is not obtainable from other media sources (due to them also likely asserting the reporter's privilege) or from the COLP (given Petitioner's extensive efforts to obtain such information from the COLP), Petitioner has failed to make a clear and specific showing that the identity of the Confidential Source is not obtainable from other available sources.

On the record before the Court, it is far from clear what other non-press sources have information regarding what Petitioner referred to as the "smear campaign" against him (of which the Subject Police Report was a part). (*See* Baram Aff. Ex. 10 (Pishevar press statement referring to "smear campaign that has been waged against me, including the falsification and distribution

of the fraudulent London police report"); *see also* Definers Compl. ¶ 2 (referring to "smear campaign" by defendants), ¶ 10 (referring to "DOES 1-10").) In the Definers Lawsuit, Petitioner had alleged in his November 6, 2017 Complaint that Definers, Rhoades and Pounder, as well as many others with whom they conspired, had fed false information in 2017 to reporters, including about a payment that was made to a British sexual assault victim. (*See* Definers Compl. ¶ 30(e).) Then, in the face of complete denials from the Definers Defendants in sworn declarations that were filed on December 6, 2017, Petitioner swore on December 29, 2017 in a declaration filed in the California Superior Court that "[a]s detailed in the Complaint, in early November 2017 I learned that Matthew Rhoades and Definers were circulating . . . false statements about me . . . [including] . . . [a]n accusation that I had paid money to settle a claim for sexual assault in London[.]" (Pishevar Super. Ct. Decl. ¶ 3.) Petitioner's counsel later was advised that similar information had been provided to Baram by the Confidential Source in this case in the Fall of 2017. (*See* Bento Decl. Ex. 11.)

In these circumstances, Petitioner has failed to make a clear and specific showing to the Court that there are no other alternative sources of the identity of the Confidential Source. Petitioner has failed to explain why Petitioner decided to drop his allegations against the Definers Defendants in the Definers Lawsuit in early February 2018, after having confirmed such allegations in a sworn declaration filed by Petitioner in late December 2017, despite the Definers Defendants' complete denials. Significantly, Petitioner — who has not submitted any sworn testimony of his own in this case — has failed to identify the source from whom he "learned" that Rhoades and Definers were "circulating" false statements about him. (*See* Pishevar Super. Ct. Decl. ¶ 3.) Thus, Petitioner has not met his burden to overcome the reporter's privilege. *See*

*In re Petroleum Prod. Antitrust Litig.*, 680 F.2d at 8 ("Disclosure was . . . improperly ordered because the States failed to carry their burden of first seeking the information elsewhere."); *Application of Behar*, 779 F. Supp. 273, 276 (S.D.N.Y. 1991) (holding that party seeking to subpoena deposition testimony from journalist must "exhaust . . . alternative sources before any deposition of [journalist] would be warranted").

* * *

In sum, applying the relevant factors, the Court in its discretion denies the Baram 1782 Application.

## CONCLUSION

For the foregoing reasons, Petitioner's Application is DENIED.

**SO ORDERED.**

DATED: New York, New York
February 18, 2020

STEWART D. AARON
United States Magistrate Judge